# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-CA-00973-COA

**RODNEY J. WILKINSON**                                                      **APPELLANT**

**v.**

**STEPHANIE WILKINSON**                                                          **APPELLEE**

DATE OF JUDGMENT:                06/05/2017
TRIAL JUDGE:                    HON. JENNIFER T. SCHLOEGEL
COURT FROM WHICH APPEALED:      HANCOCK COUNTY CHANCERY COURT
ATTORNEYS FOR APPELLANT:        WILLIAM ALEX BRADY II
                                MICHELLE ELIZABETH LUBER
ATTORNEY FOR APPELLEE:          PATRICK TAYLOR GUILD
NATURE OF THE CASE:             CIVIL - CUSTODY
DISPOSITION:                    AFFIRMED - 02/26/2019
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**BARNES, C.J., FOR THE COURT:**

¶1.     Rodney Wilkinson (Rod) appeals the Chancery Court of Hancock County's dismissal of his motion for modification of custody and contempt, as well as the chancery court's finding of contempt against him and the award of attorney's fees to Stephanie Wilkinson. Finding no error, we affirm.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

¶2.     Rod and Stephanie were married in May 2009 and separated in 2011. They agreed to a divorce based on irreconcilable differences in March 2015. One child was born of the marriage—Olivia—who was nearly four-years old at the time of the divorce. Stephanie was granted primary physical custody of Olivia and child support of $505 per month. In the

Property Settlement and Custody Agreement, the chancery court outlined a detailed visitation schedule for Rod, including physical and telephonic visits. Both parties had other children from prior relationships. Rod had custody of his daughter Alysa, who is about three years older than Olivia, and Stephanie has a son, Evan. During the time of this proceeding, custody of Evan had been temporarily transferred to Evan's father, Chris Zimmerman.[1]

¶3. Despite their divorce, Rod and Stephanie resumed their sexual relationship from August 2015 through January 2016. At times, Rod would spend the night at Stephanie's home during visitation with Olivia. However, their post-divorce relationship was extremely volatile. The Wilkinsons communicated frequently by text message, and their tone ranged from pleasant to profane.[2] Their relationship's volatility especially escalated when both parties started dating other individuals. At some point in 2016, Stephanie entered into a romantic relationship with Curtis Thomas, a long-time friend and family member, who was allegedly separated from his wife, Tabitha. Stephanie stated that Curtis pursued her. Their relationship culminated with a trip to Key West, Florida, with friends in May, but both claimed their relationship never became sexual. By August 2016, Curtis testified that Stephanie broke off the relationship because "she had to do what was right for her family." Stephanie claimed Curtis then harassed her, and she tried to enlist Rod's help to stop him.

¶4. In an attempt to show Stephanie was "unstable, violent, dangerous," and regularly put

---

[1] Stephanie was in extensive custody litigation with Chris over Evan. In September 2015, an order of temporary custody was entered transferring custody of Evan to Chris.

[2] At the hearing, over 200 pages of text messages from August 2015 to January 2017 were entered into evidence, giving insight into the tenor of their relationship.

Olivia in perilous situations, Rod presented testimony and recorded evidence (both audio and video) of several incidents where Stephanie lost her temper and used profanity, sometimes in front of Olivia. Stephanie, however, claimed that Rod "set her up" during these incidents by intentionally making her upset and then recording her angry reaction.

¶5. The most egregious incident occurred in the early morning hours of August 2, 2015. Rod was standing in the parking lot of a local bar when Stephanie intentionally crashed her vehicle into Rod's truck, moving it several feet. Olivia was not present. Stephanie admitted she was upset with Rod after seeing him that night socializing with another woman in his truck. Stephanie claimed she and Rod were "in a relationship trying to work everything out" at the time. Stephanie was arrested for domestic violence, but Rod dropped the charges.[3]

¶6. At the hearing, Rod presented several other incidents to show inappropriate behavior by Stephanie which occurred in 2016. One of Rod's friends testified that one evening in February, after a Mardi Gras parade, she and Rod's sister saw Olivia and Stephanie standing by the jukebox of the local Veterans of Foreign Wars (VFW) post. The friend commented to Stephanie, "[W]ow, now you're bringing your daughter into bars. That's awesome." Then she called and reported the sighting to Rod. Stephanie, however, explained that she and Olivia went to the VFW to take an aunt money, and her uncle asked Olivia to come inside the bar for a Coke and peanuts. They were inside the building for fifteen minutes.

¶7. In another incident in April 2016, Stephanie was at the Margaritaville Casino hotel

---

[3] This incident led to Stephanie's ex-husband Chris being awarded temporary custody of Evan. However, the court also ordered Rod not be present during Stephanie's visitation with Evan due to that relationship's volatility.

with Olivia and Evan when she read a text message on Evan's mobile telephone from Chris's girlfriend at the time. Stephanie became enraged, yelling profanity at Evan while Olivia was present. At the time, Olivia was having a telephonic visit with Rod, who could overhear Stephanie yelling at Evan. He decided to record his conversation with Olivia, and later, it was entered into evidence against Stephanie.

¶8. In May 2016, Stephanie lost her temper with Rod during a visitation exchange. She destroyed a $250 check he gave her, finding it insulting. At the time, Rod had not paid Stephanie child support since January 2016. Rod recorded these incidents, which were entered into evidence. In the chancellor's opinion, during these incidents Rod was intentionally "exploiting Stephanie's emotional insecurities and allowed her to degrade him verbally." Unfortunately, Olivia was present during these encounters and upset by her parents' conflicts.

¶9. On August 19, 2016, however, Rod lost his temper with Stephanie during a visitation exchange, which compelled Stephanie to file petitions for a domestic-abuse protection order against Rod in both Hancock County Justice Court and the chancery court. Both the justice and chancery courts granted her separate orders, prohibiting Rod from contacting her. Therefore, during this time, Rod was unable to have telephonic visits with Olivia.

¶10. On September 22, 2016, Rod filed a motion for contempt and modification of custody, seeking primary physical custody of Olivia. His contempt allegations include consistent harassment on the telephone and in person by Stephanie; physical damage to his personal property (his truck); physical and verbal abuse; negative comments about him before Olivia;

4

discussing adult matters before Olivia; alienating Olivia from him; and interfering with his physical and telephonic visitations, which included the "inappropriate" protective order preventing contact with Olivia.

¶11.    A few days later, under Rod's recommendation, Stephanie filed a police report against Tabitha, Curtis's wife, for cyberstalking/email threats and simple assault for a five-month period of harassment.[4]  On October 20, 2016, Stephanie answered Rod's motion and filed a counter-claim for contempt, alleging Rod twice failed to return Olivia at the proper time, failed to pay child support, failed to provide timely income-tax returns and insurance cards, and spoke to her in a derogatory manner.

¶12.    A hearing on the motions took place over a six-day period in February and May 2017. Nearly 1,000 pages of exhibits were entered into evidence.  At the conclusion of Rod's case-in-chief, Stephanie moved to dismiss Rod's modification of custody and allegations of her physical visitation contempt under Mississippi Rule of Civil Procedure 41(b), both of which were granted.  The chancery court found no material change in circumstance adverse to Olivia, thus an *Albright*[5] analysis was unnecessary.

¶13.    The chancellor provided detailed observations in her final judgment on the emotionally abusive pattern of behavior by both parties and its ramifications on Olivia.  We find it helpful to relay some of these observations as they explain much of the couple's—and especially Stephanie's—poor judgment and bad behavior.  The chancellor found their

---

[4] The threats ceased, and Curtis no longer communicates with Stephanie.

[5] *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983) (outlining factors considered for child-custody determinations).

relationship "alternat[ed] between love, hate, praise, criticism, accusations, sexual flirting, blaming, provocation, shaming, and guilt trips." "[B]oth [parties were] responsible for continuing in this conflict, fueling it, and blaming the other." In the parties' numerous text messages, Rod, who "maintained a facade of reasonableness," would threaten to take Stephanie to court when he did not get what he wanted. In response, Stephanie would lash out, belittling Rod with vulgar name-calling.

¶14. The chancellor also found "Rod provided no stability to Stephanie's life," and while she received financial help from him, she had to beg for it, never knowing the exact amount per month she might receive. Stephanie, however, made no attempt to extricate herself from this toxic relationship. The chancellor found "this type of parental conflict [was] not in the best interest of any child." However, Stephanie's August 2016 restraining order against Rod was actually in Olivia's best interest, bringing "some measure of peace" to her parents' "dysfunctional, love-hate relationship" by severely restricting their communication.

¶15. On June 5, 2017, the chancery court entered a final judgment, finding Rod in contempt for failure to pay child support from February through August 2016 in the amount of $2,175.81, and for not returning Olivia at the close of two holiday weekends in 2016. However, Rod was not in contempt for failing to provide timely insurance and tax documentation to Stephanie. Stephanie was not in contempt for failing to allow telephonic visitation with Olivia. However, both parties were in contempt of the original divorce decree prohibiting them from speaking to one another in a derogatory or disrespectful manner in front of Olivia. Regarding attorney's fees, the court awarded Stephanie $3,700 from Rod due

6

to his contempt of child support and visitation and additional attorney's fees of $4,933 unrelated to contempt. Finally, the chancellor prohibited the parties from communicating with one another in any form, unless it related to telephonic visitation with Olivia or other specified reasons.

**ANALYSIS OF ISSUES**

## I. MODIFICATION OF CUSTODY

¶16. Rod requests reversal of the chancellor's denial of his motion for modification of custody, and remand for an *Albright* analysis. It is uncontested that both parties were responsible for their volatile relationship and Stephanie's restraining order alleviated this conflict. However, Rod argues that Stephanie's conduct before the restraining order demonstrated an adverse material change in circumstance and warranted an *Albright* analysis for modification of custody.

¶17. This Court's "standard of review for child custody cases is quite limited. A chancellor must be manifestly wrong, clearly erroneous, or apply an erroneous legal standard in order for [the appellate court] to reverse." *Johnson v. Gray*, 859 So. 2d 1006, 1012 (¶31) (Miss. 2003). A chancellor's findings of fact "may not be set aside or disturbed upon appeal if they are supported by substantial, credible evidence." *Id.* at (¶32). In order for child custody to be modified, the noncustodial parent must prove: "(1) a material change in circumstances has occurred since the issuance of the judgment or decree sought to be modified, (2) the change adversely affects the welfare of the child, and (3) the proposed change in custody would be in the best interest of the child." *Gilliland v. Gilliland*, 984 So. 2d 364, 367 (¶7)

7

(Miss. Ct. App. 2008) (citing *Lambert v. Lambert*, 872 So. 2d 679, 683-84 (¶18) (Miss. Ct. App. 2003)). A change in circumstances refers to "the overall living conditions in which the child is found. The 'totality of the circumstances' must be considered." *Riley v. Doerner*, 677 So. 2d 740, 743 (Miss. 1996) (quoting *Tucker v. Tucker*, 453 So. 2d 1294, 1297 (Miss. 1984)). If an adverse material change is found, the chancellor will next "apply the *Albright* factors to determine whether modification is in the child's best interest." *White v. White*, 26 So. 2d 342, 351 (¶28) (Miss. 2010). In the absence of a material change, the *Albright* factors need not be considered. *Id.* "Above all . . . as in original awards of custody . . . [the] polestar consideration [is] the best interest and welfare of the child." *Johnson*, 859 So. 2d at 1013 (¶33) (quoting *Riley*, 677 So. 2d at 744).

¶18. The chancery court ruled that there was no material change in circumstance adverse to Olivia since the divorce decree and that changing custody to Rod was not in the child's best interest. The chancery court found both parties were at fault for their conflicts, which were not in the best interest of the child; however, Stephanie's restraining order against Rod alleviated the aggression between them. Evidence showed Olivia was doing well in school and healthy. Because a change in custody tends to be a "jolting, traumatic experience" for a child, the chancellor stated it is only parental behavior that poses a clear danger to the child's mental or emotional health that can create a "sufficient basis to seriously consider the drastic legal action of changing custody." *Lambert*, 872 So. 2d at 684 (¶22) (quoting *Ballard v. Ballard*, 434 So. 2d 1357, 1360 (Miss. 1983)). The chancellor did not find Stephanie's behavior rose to that level. We agree.

8

¶19. Rod claims the chancery court applied an erroneous legal standard by failing to consider the totality of the circumstances regarding the impact of Stephanie's inappropriate behavior on Olivia. On appeal, he discusses at length the following examples of such behavior since their divorce, which occurred over a year and one-half, as proof of an adverse material change: the truck incident; the VFW incident; the Margaritaville Casino incident; the recordings of Stephanie losing her temper at Rod during visitation exchanges; Stephanie's request to Rod to stop Curtis's harassment; the protection order against Rod; the criminal report against Tabitha; the text messages between the parties; and Evan's testimony.[6]

¶20. It is long established that:

> Before custody may be changed, it must be shown that such conduct did substantially adversely affect the children and that it would, therefore, not be in the best interest of the children to remain with the custodial parent. Detrimental effect may not be presumed from such conduct and thus form the sole basis for denying custody.

*Kavanaugh v. Carraway*, 435 So. 2d 697, 700 (Miss. 1983); *see also Gilliland*, 984 So. 2d at 367 (¶¶8, 10) (affirming the denial of custody modification because ongoing conflict of

---

[6] Evan's testimony was taken at the end of the hearing in chambers with only the chancellor present. His testimony was sealed and not provided to the parties. The testimony was unsealed for the purposes of this appeal. Evan testified about Stephanie's interaction and behavior with Olivia and him. He was unable to testify much about Olivia's current environment because Stephanie had been unable to exercise regular visitation with him due to the custody litigation. After the interview, the chancellor concluded that Evan's testimony had been influenced by his father Chris. She stated: "It is also evident from the other evidence presented that the children's two fathers are working together against the interest of the mother, Ms. Wilkinson." Therefore, the chancellor found Evan's testimony unreliable and gave it minimal weight. After reviewing the testimony, we cannot say these findings are an abuse of discretion.

the parents did not create material change in circumstances and determining that even if it had, there was no evidence that the children suffered an adverse effect). Ultimately, the chancellor found in the totality of the circumstances that Olivia was not living in an unhealthy home environment with her mother, and there was no evidence Rod's home environment would be any better. The chancery court did not condone Stephanie's numerous expressions of anger; nor do we. However, we agree with the chancellor's findings that there is no evidence Olivia suffered harm or "clear danger" from Stephanie's aggressive verbal and other behavior, and it did not create a "persistently adverse environment."[7] Her bad behavior usually manifested itself when interacting with Rod. Neither party appeared to be a poor parent individually, but when interacting, they brought out the worst in one another, often in the presence of Olivia. Unfortunately, Stephanie could not restrain herself from participating in this "dysfunctional cycle." While the incidents Rod points to are extremely unflattering to Stephanie, we can see a certain level of manipulation by Rod where he would goad Stephanie and then record her angry reactions in order to further his custody case. Because the parties are now limited in their contact with one another due to Stephanie's restraining order, these issues have significantly improved.

¶21. We agree with the chancellor that Stephanie's conduct "does not pose a clear danger to the child's mental or emotional health as a basis sufficient to seriously consider the drastic legal action of changing custody." Further, and most importantly, the best interest of the

---

[7] *See Potts v. Windham*, 56 So. 3d 589, 593 (¶14) (Miss. Ct. App. 2011) (finding that evidence the mother used curse words in front of the child and she and her new husband argued in front of the child was insufficient to warrant modification of custody when the father admitted there was no adverse effect on the child).

10

child appears to be in Stephanie's continued primary physical custody. Accordingly, we cannot find the chancellor abused her discretion in failing to find a material change of circumstances adverse to the child and declining to apply the *Albright* factors.

## II.    CONTEMPT

¶22.    Both parties filed motions for contempt against one another for various reasons. We shall address each contempt issue in turn.

¶23.    The law on contempt is well established:

> The primary purpose of a civil-contempt order is to enforce compliance with a court order. . . .   "Failure to comply with a court order is prima facie evidence of contempt.  To rebut . . . a defendant must show an 'inability to pay, that the default was not willful, that the provision [violated] was ambiguous, or that performance was impossible.'"   An adjudication of civil contempt must be proven by clear and convincing evidence.  The standard of review for civil contempt on appeal is manifest error, meaning "the factual findings of the chancellor are affirmed unless manifest error is present and apparent."

*Stallings v. Allen*, 201 So. 3d 500, 504 (¶14) (Miss. Ct. App. 2016) (citations omitted). Contempt issues are a question of fact decided on a case-by-case basis. *Gilliland*, 984 So. 2d at 369 (¶19).  A chancellor is given "substantial discretion in deciding contempt matters because of the chancellor's 'temporal and visual proximity' to the litigants." *Id.* at 369-70 (¶19) (quoting *Mabus v. Mabus*, 910 So. 2d 486, 491 (¶20) (Miss. 2005)).

### A.    Rod's Motion for Contempt Against Stephanie

¶24.    Rod argues the chancellor erred in dismissing Rod's motion for contempt against Stephanie for interfering with his physical and telephonic visitation.  The chancery court found because of the parties' "quasi-reconcil[iation]" and "'on again off again' de facto

11

marital relationship post-divorce from August 2015 through January 2016," neither party was "in willful, contumacious and obstinate contempt" of the visitation schedule during this period. The chancellor relied upon *Rasch v. Rasch*, 250 Miss. 885, 168 So. 2d 738 (Miss. 1964), by analogy for the principal that a custody and support order in a divorce decree is suspended while the parties resume marital relations. *Id.* at 897, 168 So. 2d at 744. The evidence showed during this period Rod would spend the night at Stephanie's home as much as five days per week. Moreover, at the hearing, Rod's testimony indicated he only missed one weekend of physical visitation, September 18, 2015, and it was made up the following weekend. While he claimed to miss other visitation weekends during July and August 2016, he could not recall specific dates. The chancellor found that while technically, Stephanie may have been in noncompliance with the physical visitation order on September 18, the evidence did not show she was in willful, contumacious, and obstinate contempt, and Rod suffered no prejudice.

¶25. The chancellor also found there was insufficient evidence to establish Rod was denied telephonic visits under the visitation schedule. The custody agreement allowed both parents daily telephonic visitation with Olivia between 5:30 and 7:30 p.m. Additionally, "[t]he child [could] contact either parent at all other reasonable times." The testimony showed Rod frequently asked for telephonic visitation outside of the specified time period. Additionally, he would request to speak to Olivia when she was asleep. However, even if Rod was denied some telephonic visits, the chancellor found the evidence did not show Rod was denied visits to which he was actually entitled. We agree.

¶26. Rod argues willful contempt for denial of visitation the weekend of September 18 is clearly shown from the parties' text messages. It is undisputed that September 18 was Rod's visitation weekend. On that day, Rod and Stephanie had an argument about visitation via text message. Initially and foremost, Stephanie told Rod that Olivia wanted "to stay" with her and did not want to visit Rod that weekend. Rod then became angry. Stephanie, in turn, became angry, and the couple began bickering intensely. However, the chancellor did not commit manifest error in finding no contempt for this incident.

¶27. The chancellor did not "ignore" Stephanie's September 18 denial of visitation, as Rod states, but found it did not rise to the level of contumacious contempt because, at the time, the parties were engaged in a sexual relationship and Rod was at Stephanie's home quite frequently. Further, at the hearing, Rod testified several times that the parties "didn't stick . . . to what the papers said" for visitation. However, both parties used noncompliance of the visitation schedule as a reason to bicker, blame, and threaten one another. Stephanie also testified that the parties were altering Olivia's visitation to correspond with Evan's visitation, which Rod denies. Furthermore, Rod admitted he received more time with Olivia than the agreement granted.

¶28. Rod also claims the text messages show he was denied telephonic visits on numerous occasions. However, we agree with the chancellor that even if some text messages show Stephanie may have denied telephonic visitation occasionally, the texts alone cannot be relied upon to show a denial of telephonic visitation rising to the level of contempt. According to Rod's and Stephanie's testimonies, the parties, as well as Rod and Olivia, were

13

communicating via telephone conversations not indicated by the text messages. Also, during the period in August 2016 when Rod was especially aggrieved at not being able to speak with Olivia, the evidence shows he was never denied communication with her. Actually, Rod did not attempt to call Olivia because he thought it might be prohibited by the restraining order. Stephanie was in the Bahamas at this time while her mother cared for Olivia, and Rod did not attempt to call either Stephanie or her mother to arrange a telephonic visit with Olivia.

¶29. We conclude the chancellor was within her discretion in finding Stephanie not in contempt for denial of Rod's physical or telephonic visitation.

### B. Stephanie's Motion for Contempt Against Rod

¶30. Stephanie filed a counter-claim against Rod for contempt for failing to pay child support, failing to return Olivia at the proper time on two occasions, failing to provide timely income-tax returns and insurance cards, and speaking to her in a derogatory manner.

### 1. Child Support

¶31. Stephanie was awarded child support in the amount of $505 per month. In her counterclaim for contempt, she contended Rod was in arrears in the amount of $7,385. The chancellor found Rod in contempt for failing to pay child support from February through August 2016 in the amount of $2,175.81, but she did not find either Rod or Stephanie in contempt for the post-divorce period between August 2015 through January 2016 based upon suspension of the support order due to their "quasi-marital relationship" and the rationale of *Rasch*. Further, it is undisputed that Rod paid Stephanie timely support payments from March through July 2015.

14

¶32. Testimony showed that from August 2015 through January 2016 Rod was staying at Stephanie's home several nights a week and seeing Olivia almost every day, either at his home or hers. The chancellor found Olivia was being cared for financially just as she had been when the parties were married, with Rod providing payments for rent, household expenses, groceries, and other items. Even so, the chancellor noted that occasionally, Stephanie had to "beg" Rod for financial help during this time, and the parties fought constantly over money and Olivia. Also, the chancellor found Rod was not entitled to a "credit" toward future child support payments that he incurred once the parties broke up in January 2016 due to the expenditures he made to the entire family during the time Rod and Stephanie resumed marital relations.

¶33. During the seven month period of February through August 2016 that Rod was found in contempt for child support, his total support obligation was $3,535. The chancellor found the anger between the parties during the period of contempt was so strong it "suggests that Rod willfully refused to pay Stephanie the support out of spite." Rod was laid off from his job in February 2016 and did not make child support payments in February, March, or April 2016. However, Rod continued to make private school tuition payments directly to the school during this time. Rod began making support payments in May 2016, but they were sporadic and partial. In September 2016, when Rod filed suit, he resumed making the full payment of $505 per month. The chancellor found Rod in arrears the amount of $2,285. However, the chancellor granted Rod a credit during this period for certain clothing items and dental care for Olivia totaling $109.19, resulting in a total support arrearage of

15

$2,175.81.

¶34.    Additionally, the chancellor denied Rod a credit for private school tuition under *Farrior v. Kittrell*, 12 So. 3d 20 (Miss. Ct. App. 2009). *Farrior* found the chancellor in error for giving the noncustodial parent a child-support-payment credit for private-school tuition not ordered by the court. *Id.* at 23 (¶15). For support, the *Farrior* court cited *Cook v. Whiddon*, 866 So. 2d 494, 500 (¶24) (Miss. Ct. App. 2004), for the proposition that "when a parent chooses to make voluntary payments for private school tuition, he is not entitled to use those payments to set off his child support payments." *Farrior*, 12 So. 3d at 23 (¶14).

¶35.    Rod contends the chancellor erred in finding him in contempt for failure to pay child support from February 2016 through August 2016; however, the crux of his argument is that he was not given credit for paying certain living expenses during the time he was frequently staying overnight at Stephanie's house from August 2015 through January 2016. These payments he argued should offset his missed support payments. Rod calculates that by January 2016, before he stopped payment in February, he had paid Stephanie more than was required, for a total overpayment of $2,181. According to him, the partial payments he made from May to August 2016, subtracted from the total overpayment, put his support contributions "ahead" by $159.80, excluding approximately $1,500 in school tuition he paid during this time. Rod also specifically points to a rent payment he made to Stephanie of $800, and $1,000 he withdrew from the bank and paid Stephanie, which he claims the chancellor did not credit him.

¶36.    Rod attempts to distinguish *Rasch* because there the parties were still married and not

16

divorced as here. While true, this fact does not invalidate the court's reliance on the case by analogy – it is the resumption of a marital-like living situation that suspended the divorce decree's child-support obligation, because the child was being supported as if the couple were married, regardless of whether they actually were. Rod also notes that he never fully moved back into Stephanie's home, but just spent the night. Even so, this distinction does not change the court's analysis. We find Rod's arguments without merit.

¶37. The law of contempt actions involving unpaid child support is well established:

> [A] prima facie case of contempt has been established when the party entitled to receive support introduces evidence that the party required to pay the support has failed to do so. At this point, the burden shifts to the paying party to show an inability to pay or other defense; this proof must be clear and convincing and rise above a simple state of doubtfulness. Whether a party is in contempt is left to the chancellor's substantial discretion. Moreover, the chancery court should be affirmed unless manifest error is present and apparent.

*McIntosh v. Dep't of Human Servs.*, 886 So. 2d 721, 724-25 (¶11) (Miss. 2004) (citations omitted). The chancellor correctly found the parties were in a de-facto marital relationship from August 2015 through January 2016; so no child support was due. We agree. Olivia's financial needs were met. The evidence shows Rod had not completely moved back in but was spending several nights a week at Stephanie's home with Olivia present.

¶38. Contrary to the separate opinion, the chancellor did not "forgive" Rod's child support payments. Instead, she found Rod had already paid for the child's support. The chancellor determined that from August 2015 through January 2016, when the couple was in their "'on again off again' de facto marital relationship,"

> the child was being cared for financially, receiving support and maintenance,

17

> as she was during the marriage of the parties as a member of the parents' household. . . . During this time period, Rod made payments toward rent, household expenses, groceries and other items for Stephanie and Olivia. . . . The Court treats these payments as Rod's support of the family as a whole, including himself, just as if the parties had been married based upon the Court's rationale in *Rasch*.

The chancellor found Rod made the payments to the household during this time period, and there is no evidence to the contrary. We cannot disagree with these findings or rationale. The support of the child was paramount, and the chancellor's ruling does nothing to diminish this interest. In fact, during this period, Rod was supporting the child beyond the support ordered. Rod was not, however, entitled to a credit toward future child support obligations or an overpayment of child support because "Rod was supporting his family and enjoying the benefits of the familial relationship as if the parties were married. Although Rod expended more toward the support of the family as he was liable for under the child support order, Rod was . . . enjoying the fruit of these expenditures." The separate opinion also disputes that the couple was even quasi-reconciled during the time period, stating there was no "actual reconciliation" but only a "brief reconnection." Our limited standard of review prohibits such fact finding unless there is manifest error, and there is none. Moreover, we are not "creating" another category of "quasi-reconciled" marriage as a matter of law as the separate opinion suggests. The chancellor merely used this term to describe the status of the couple's relationship during this period, the important aspect of the relationship being Rod's financial support of the family unit, including his child.

¶39. Also, we cannot find error with the chancellor's ruling on contempt for the period of February through August 2016. Rod does not offer an inability-to-pay or any other defense;

18

he argues his payments for living and other expenses and private-school tuition should offset his missed payments. The chancellor found Rod had the ability to pay due to a tax refund in the amount of $8,733 in 2016, and the figures he presented in his Uniform Chancery Court Rule 8.05 financial statement. Rod did not provide bank statements to the court to attempt to counter his ability to pay. Consequently, we find there was substantial evidence for the chancellor to find Rod in contempt for failing to pay child support in the amount of $2,175.81 from February through August 2016.

## 2. Physical Visitation

¶40. Rod claims the chancery court erred by finding him in contempt for failure to return Olivia at the end of Labor Day and Columbus Day weekends in September and October 2016, respectively.

¶41. To determine whether a party has deliberately and intentionally violated a court order in contempt proceedings,

> the inquiry is limited to the issues as to whether or not the order was violated, whether or not it was possible to carry out the order of the court, and if it was possible, whether or not such violation was an intentional and willful refusal to abide by the order of the court.

*Ladner v. Ladner*, 206 So. 2d 620, 623 (Miss. 1968), *abrogated on other grounds by Bubac v. Boston*, 600 So. 2d 951 (Miss. 1992)). The custody agreement gave Rod weekend visitation the first and third weekends of each month from 5:30 p.m. on Friday until 5:30 p.m. on Sunday. The agreement also provided a holiday visitation schedule, providing "[h]oliday visitation shall supersede weekend and weekday visitation . . . and will be set by the school calendar . . . ." A schedule was given for the following specific holidays: Easter, Spring

19

Break, Thanksgiving, Christmas, Mother's Day, and Father's Day. In even years, Rod received Olivia for certain holidays. Labor Day and Columbus Day were not specified on the holiday schedule.

¶42. Rod argues the custody agreement is ambiguous; therefore, he should not be found in contempt. He also claims to have reasonably believed he was entitled to visitation on the Labor Day and Columbus Day holidays and in good faith returned Olivia on Monday evening instead of Sunday evening. We are not persuaded by these arguments.

¶43. The parties' text messages and Rod's testimony indicate his actions were in willful disregard of the custody agreement. His testimony showed on the Sunday of Labor Day weekend, Stephanie was at the point of exchange—the police station—waiting for Rod at 5:30 p.m. After waiting thirty minutes, she sent a text message to Rod asking where he was. An hour later and after three more inquiries from Stephanie, Rod responded that he was keeping Olivia another day because he interpreted "the divorce papers" to allow him to have her on "school calendar holidays" in even years. Stephanie did not respond to this message.

¶44. On the Sunday of Columbus Day weekend, a similar scenario occurred. Testimony showed Stephanie sent Rod a text message twice asking where he was around 5:30 p.m. Rod responded after approximately twenty minutes: "We home. It's a school calendar holiday tomorrow." Stephanie responded that the attorney stated it "only applies to holidays listed specifically in papers." She then expressed her anger at this occurring a second time. Rod, however, refused to bring Olivia to Stephanie that day.

¶45. The holiday schedule was not ambiguous. There was no provision for "generic school

20

holidays." As the chancellor stated, Rod should have erred on the side of caution, and either deferred to Stephanie or sought legal counsel if he was confused about the holiday visitation schedule for these two weekends. Instead, he "simply refused to cooperate and kept the child."

¶46. The chancellor did not err in finding Rod in contempt for failure to return Olivia from visitation these two weekends.

### 3. Derogatory Speech

¶47. Both parties were found in contempt of the divorce decree for speaking in a derogatory or disrespectful manner to one another in front of Olivia. Rod argues there is no evidence to support the finding of contempt against him. He claims any evidence of such statements was rebutted by testimony that the child was in a vehicle or otherwise unable to hear the exchange.

¶48. Most of the couple's frequent derogatory exchanges were not spoken before the minor child, but the chancellor found on at least one instance, they were: "Rod admitted to calling Stephanie a profane name coupled with a vulgar suggestion in the presence of the minor child during a visitation exchange where the minor child was crying and screaming." Stephanie points to another visitation exchange where Olivia heard Rod make another vulgar suggestion to Stephanie while the vehicle windows were open. We cannot say the chancellor committed manifest error in finding Rod in contempt on this issue.

### III. ATTORNEY'S FEES

¶49. Rod contends that the chancellor erred in awarding attorney's fees for Rod's contempt

21

in the amount of $3,700, as well as general attorney's fees of $4,933 for a total amount of $8,633. Additionally, Stephanie requests this Court to award her attorney's fees on appeal. We shall discuss each fee award in turn.

¶50. This Court's standard of review for attorney's fees is limited:

> An award of attorney's fees in domestic cases is largely a matter entrusted to the sound discretion of the trial court. Unless the chancellor is manifestly wrong, [her] decision regarding attorney['s] fees will not be disturbed on appeal. Absent an abuse of discretion, the chancellor's decision in such matters will generally be upheld.

*Lauro v. Lauro*, 924 So. 2d 584, 591 (¶29) (Miss. Ct. App. 2006) (citations omitted).

### A. Attorney's Fees for Contempt

¶51. The chancellor found the attorney's fees incurred by Stephanie were reasonable, and billed at a reasonable rate given the time involved to prosecute the contempt allegations. The chancellor found the rate of $225 per hour customary, and her total fees incurred were $18,498.27. Stephanie's counsel proffered that twenty-percent of his overall fees were related to contempt, which the chancellor accepted as proper.

¶52. The law on attorney's fees for contempt is as follows:

> "When a party is held in contempt for violating a valid judgment of the court, attorney's fees should be awarded to the party that has been forced to seek the court's enforcement of its own judgment. Fees awarded on this basis, though, should not exceed the expense incurred as a result of the contemptuous conduct." That is, fees incurred litigating other matters—such as custody modification or child support—are not recoverable based on the contempt.

*Heisinger v. Riley*, 243 So. 3d 248, 259 (¶45) (Miss. Ct. App. 2018) (citations omitted). "[I]n contempt actions, attorney's fees are awarded 'to make the plaintiff whole.'" *Bounds v. Bounds*, 935 So. 2d 407, 412 (¶18) (Miss. Ct. App. 2006) (quoting *Mabus*, 910 So. 2d at 490

22

(¶13)). The Mississippi Supreme Court established several factors to determine the proper amount of attorney's fees to award in domestic cases in *McKee v. McKee*, 418 So. 2d 764, 767 (Miss. 1982). However, "the establishment of the *McKee* factors [is] not necessary" to recover attorney's fees for willful contempt of a lawful court order. *Lewis v. Pagel*, 172 So. 3d 162, 178 (¶40) (Miss. 2015) (quoting *Mixon v. Mixon*, 724 So. 2d 956, 964 (¶29) (Miss. Ct. App. 1998)).

¶53. Here, the chancellor found a *McKee* factor analysis was unnecessary to award attorney's fees because some of Stephanie's contempt claims were successful. Accordingly, the court award Stephanie approximately twenty-percent of $18,498.27, or $3,700 in attorney's fees for Rod's contempt of child support and visitation. Because both parties were found in contempt for derogatory remarks, the court declined to award attorney's fees to either party on that issue based upon the clean-hands doctrine.

¶54. Rod argues that the chancellor erred as a matter of law in stating one who successfully prosecutes a contempt action "is *entitled* to attorney's fees without a showing of need" instead of "*eligible*." (Emphasis added). We do not interpret the chancellor's remarks to mean it is a mandatory finding but that the court is authorized to award fees under circumstances such as this.

¶55. Additionally, because Stephanie was also found in contempt on the derogatory remarks, Rod argues she cannot receive any attorney's fees for contempt because of the unclean-hands doctrine. This doctrine "prevents a complaining party from obtaining equitable relief in court when he is guilty of willful misconduct in the transaction at issue."

23

*Vincent v. Rickman*, 167 So. 3d 245, 249 (¶11) (Miss. Ct. App. 2015) (quoting *Bailey v. Bailey*, 724 So. 2d 335, 337 (¶6) (Miss. 1998)). However, we are not persuaded by this argument. The court did not award attorney's fees to either party because both were found in contempt on this issue. This was the only issue for which Stephanie was found in contempt; however, Rod was found in contempt on two others. We find no error with the chancellor's award.

### B. General Attorney's Fees

¶56. Rod claims the chancellor erred in awarding additional attorney's fees to Stephanie beyond the amount for contempt in the amount of $4,933.

¶57. The *McKee* factors state that an award of attorney's fees "should be fair, should compensate only work actually performed, and should be based upon a finding that the work was reasonably required and necessary." Deborah H. Bell, *Bell on Mississippi Family Law* § 12.02 [1] (1st ed. 2005) (citing *McKee*, 418 So. 2d at 767). This Court permits an award of attorney's fees "in a divorce case where the requesting party establishes an inability to pay." *Williams v. Williams*, 179 So. 3d 1242, 1254 (¶42) (Miss. Ct. App. 2015) (quoting *Stewart v. Stewart*, 2 So. 3d 770, 776 (¶18) (Miss. Ct. App. 2009)). "However, if a party is financially able to pay her attorney, an award of attorney's fees is not appropriate." *Id.* This determination "is a discretionary matter left to the chancellor." *Id.*

¶58. The chancellor examined Stephanie's Rule 8.05 financial statement dated March 2017, as well as her monthly bank statements from February 2015 through October 2016. Her Rule 8.05 financial statement showed a net monthly income of $4,207.09 and combined

living expenses of $4,287. For 2015, her bank statements showed "several months of considerably less credits and debits" than her Rule 8.05 financial statement, as did four bank statements in 2016. However, her bank statements for four months in 2016 indicate deposits and credits exceeded her Rule 8.05 financial statement. The chancellor found these four months did not show "the complete picture." The court ultimately found Stephanie had the inability to pay a portion of her attorney's fees because she usually does not have surplus income, is $38,500 in debt, has negative equity of $9,000 in her vehicle, and no other assets. The chancellor found Rod's 8.05 financial statement had a surplus of income above his expenses with a net monthly income of $3,348.20 and monthly expenses of $3,033.83. Additionally, Rod received a tax refund of $8,733, which increased his income. Rod's attorney's fees totaled $20,465.62. The chancellor concluded Rod had the ability to pay a portion of Stephanie's fees. Considering the *McKee* factors, the chancellor awarded Stephanie one-third of her remaining attorney's fees not attributable to contempt or $4,933.

¶59. Rod argues that because of the positive discrepancies between Stephanie's Rule 8.05 financial statement and bank statements, and the chancellor's finding that Stephanie had the ability to earn more income than stated, she has the ability to pay her own fees. The chancellor, however, gave a detailed analysis of Stephanie's bank records, and concluded there was substantial evidence showing Stephanie's inability to pay a portion her attorney's fees. We cannot say the chancellor abused her discretion in this regard.

### C.    Appellate Attorney's Fees

¶60. In her appellate brief, Stephanie requests this Court order Rod to pay one-half of her

attorney's fees for defense of this appeal. "This Court has generally awarded attorney's fees on appeal in the amount of one-half of what was awarded in the lower court." *Lauro*, 924 So. 2d at 592 (¶33). Stephanie was awarded a total of $8,633 in attorney's fees; one-half of this amount would be $4,316.50.

¶61. This request was made in a separate paragraph of Stephanie's brief and supported by proper caselaw. However, since Stephanie filed her brief, the Mississippi Supreme Court has held that a request for appellate attorney's fees must be made in a motion that conforms with Mississippi Rule of Appellate Procedure 27(a). *Latham v. Latham*, No. 2017-CA-00856-SCT, 2019 WL 242958, at *5 (¶24) (Miss. Jan. 17, 2019) (holding that "henceforth, such requests must comply with Rule 27(a)"). Stephanie did not file such a motion. Accordingly, we deny Stephanie's request for appellate attorney's fees without prejudice so she may file her request in a motion that conforms with Rule 27(a) before the mandate issues.

## CONCLUSION

¶62. We find the chancellor did not abuse her discretion in dismissing Rod's motion to modify custody. No *Albright* analysis was necessary because no adverse material change was found, and the best interest of the child was in Stephanie's continued custody. Regarding contempt, the chancellor correctly found Stephanie was not in contempt for interfering with Rod's physical and telephonic visits with Olivia. Additionally, there was substantial evidence to show Rod was in contempt for failing to pay child support from February through August 2016, and failing to return Olivia on the proper day on two occasions. The chancellor did not err in finding Rod, as well as Stephanie, in contempt for derogatory speech

26

in front of Olivia.  Finally, we affirm the chancellor's awards of attorney's fees to Stephanie.

¶63.   **AFFIRMED.**

**J. WILSON, P.J., GREENLEE, WESTBROOKS, TINDELL, McDONALD AND LAWRENCE, JJ., CONCUR.   CARLTON, P.J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. McCARTY, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED IN PART BY McDONALD, J.  C. WILSON, J. NOT PARTICIPATING.**

**McCARTY, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶64.   While I generally agree with the conclusion reached by the majority, I write separately to emphasize that unless parties remarry or there is direct support we should not approve a suspension of child support.  Because child support payments vest every month, a chancery court has no authority to forgive these payments once they have accrued.  Likewise, support payments cannot be suspended unless there is direct support.  Because the record in this case does not support a suspension of payments, I respectfully concur in part and dissent in part.

¶65.   Our focus throughout should be on the child because the "[d]uty to support children is upon both parents[,] and it is a continuing duty, both legal and moral in nature, and a vested right of the child growing out of the marriage relation." *Alexander v. Alexander*, 494 So. 2d 365, 368 (Miss. 1986).  This vested right is paramount.  Our precedent stands as "a constant reminder that child support payments are made to the custodial parent for the benefit of the child." *Tanner v. Roland*, 598 So. 2d 783, 786 (Miss. 1992).  "The child's right to his parent's support cannot be bargained or contracted away by his parents," and the Supreme "Court has frowned on the use of self-help measures to remedy child support problems." *Id*.  Support is for children and not a thing that can be pushed and pulled like taffy by parents.

27

¶66. As a result, our courts "have consistently held that child support payments vest in the child as they accrue." *Id*. "Once they have become vested, just as they cannot be contracted away by the parents, they cannot be modified or forgiven by the courts." *Id*. (collecting cases). "Each payment that becomes due and remains unpaid becomes a judgment against the supporting parent," and "[t]he only defense thereto is payment." *Id*. (citations and internal quotation marks omitted).

¶67. These monthly judgments are in favor of the child and should not be treated lightly. In certain cases the judgment can be discharged by a non-custodial parent when they directly support a child. *See Burkett v. Burkett*, 537 So. 2d 443, 446 (Miss. 1989). In those situations, the non-custodial parent will be entitled to a credit based upon the amount of direct support. *Id*.

¶68. In this case, the chancellor found "that the parties were quasi-reconciled and engaging in an 'on again off again' de facto marital relationship post divorce between August 2015 through January 2016." As a matter of law, I would find that there is no such thing as "quasi-reconciled," as one is either married or one is not, and there are requirements before the union is legally recognized. *See* Miss. Code Ann. § 93-1-15 (Rev. 2013) (requiring those seeking to marry have both a license and a solemnization ceremony). As our Supreme Court has recently noted, the same statute refuses to recognize common law marriage, and our State "has refused to acknowledge common-law marriages for more than sixty years." *Sanderson v. Sanderson*, 245 So. 3d 421, 428 n.7 (Miss. 2018). There is no such category as "quasi-reconciled," and we should not create one.

¶69. The facts of this case do not demonstrate that there was an actual reconciliation or remarriage. The trial court ruled that "Both parties testified that during this period Rod would stay in and spend the night in Stephanie's home with Stephanie and the child sometimes as much as five (5) days per week." Yet five days a week is not every day, and Rod repeatedly testified that was not how long he stayed with Stephanie during the months he was "reconnecting" with her. In fact, Rod stated he stayed with her at most five nights in one month, not five nights per week. Rod testified: "It all depended. I might stay one night a week, or there might be weeks where I don't stay at all, there might be a week where I stayed two nights." Rod emphasized he "stayed the night, but I was never living there in that house."

¶70. This is certainly not a resumption of the martial relationship, and it is barely a relationship at all. Rod certainly did not see it as serious: He said "all I did was go and stay the night." He testified that his "clothes were never there," and "[n]one of my stuff was ever there" because it all stayed at his mother's house. He did not have more than two days' worth of clothes at Stephanie's house, did not get his mail there, and no bills were in his name. Rod put it bluntly: "I wasn't living there." He reiterated that he did not know how often he stayed there in a month: "Depending, you know, like I said, I might go a week, stay two nights, and I might be two weeks before I stay another night." This is not a sufficient factual basis to find that the couple was "quasi-reconciled," even if such a creature existed in our law.

¶71. The majority concludes that it was "the resumption of a marital-like living situation

that suspended the divorce decree's child-support obligation," but no case in Mississippi has ever made such a ruling. The one case cited dealt with a couple that was married and not divorced. *Rasch v. Rasch*, 250 Miss. 885, 896, 168 So. 2d 738, 743 (1964). There, our Supreme Court reasoned "that the resumption of the marital relations between the father and mother . . . and the continuation of the marital relations for a period of approximately three years, during which time the child received its support and maintenance as a member of the parents' household, rendered the custody decree inoperative." *Id*. Yet, as the majority notes, the parents there were never divorced, and the child was again a member of a single and functioning household. As set out above, marriage is a binary condition. Once there is a divorce, the only way the marriage can resume is through remarriage. *Rasch* cannot apply by analogy because it dealt with married persons, and here we deal with unmarried ones.

¶72. Ultimately, the *Rasch* case simply reinforces our core precedent that a parent has the duty to support a child pursuant to a court order. *See Wright v. Standard Oil Co.*, 470 F.2d 1280, 1288 (5th Cir. 1972) (stating that *Rasch* simply "reaffirms the rule that a father's duty to support his children continues after a divorce or the awarding of custody to the mother"); *Wilson v. Wilson*, 464 So. 2d 496, 498-99 (Miss. 1985) (citing to *Rasch* and ruling that our courts "regard the duty to support children to be upon both parents and a continuing duty, both legal and moral in nature, and a vested right of the child growing out of the marriage relation"). The case also stands for the proposition that a valid remarriage will nullify a support decree. *See* Matthew Thompson, *Miss. Divorce, Alimony and Child Custody* § 14:21 (2018) (relying on *Rasch* and stating that "[t]he remarriage of the parents to each other after

30

a divorce nullifies the decree and restores the parental rights of the parties to the same extent as if no divorce had ever been granted"). It is the act of remarriage that eliminates the prior decree, or act of reconciliation before a divorce is final.

¶73. We cannot forgive vested child support payments, and especially not because the parents have periods where they want to briefly "reconnect." The support payments are for the child. There is no such evidence in this record, by analogy or otherwise, that the parents of the child remarried or were actually reconciled. Critically, there was not a single functioning household as in *Rasch*. Here, the child lived with her mother, and for a period of time her father would come over and spend the night but sometimes not for weeks at a time and in his view never lived there at all. If Rod was tendering direct support he could be entitled to a credit, but we do not need to suspend child support payments due to the whims of the adults when the payments exist for the benefit of the child. For the reasons above, I concur in part and respectfully dissent in part.

**McDONALD, J., JOINS THIS OPINION IN PART.**

31