# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2002-CA-01526-SCT

*JULIE ANN GRAY JOHNSON*

*v.*

*MICHAEL E. GRAY*

| | |
|---|---|
| DATE OF JUDGMENT: | 7/3/2002 |
| TRIAL JUDGE: | HON. WILLIAM JOSEPH LUTZ |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | STEPHEN L. BEACH, III |
| ATTORNEY FOR APPELLEE: | BENTLEY E. CONNER |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 11/20/2003 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE McRAE, P.J., EASLEY AND CARLSON, JJ.

### McRAE, PRESIDING JUSTICE, FOR THE COURT:

¶1. In this child custody modification case, a mother appeals from the chancellor's judgment changing custody of her daughter to her ex-husband. Finding no manifest error in the chancellor's decision and no evidence of partiality by the chancellor, we affirm.

### FACTS AND PROCEEDINGS BELOW

¶2. Julie Ann Gray ("Julie") and Michael E. Gray ("Michael") were married on July 24, 1998. Their marriage produced one child, Hailey Ann Gray ("Hailey"), who was born September 8, 1998. Julie and Michael separated sometime between May and July 1999. On May 19, 2000, Michael and Julie were divorced based on irreconcilable differences. Julie was found to be a fit and proper parent at that time and was awarded custody of Hailey, with Michael having liberal visitation rights.

¶3. On October 8, 2001, Michael filed a motion to modify the divorce decree and to have a temporary restraining order placed on Julie. He also filed a motion for emergency custody relief. On October 9, 2001, an emergency hearing was held at which Michael and several of Julie's family members testified that they felt Hailey was in danger due to Julie's increased consumption of alcohol. The chancellor granted a temporary restraining order and awarded Michael temporary custody of Hailey until further order of the court. Julie was allowed supervised visitation with Hailey through prearranged meetings with Keith Johnson ("Keith"), Julie's fiancé.

¶4. At trial an abundance of evidence was presented concerning Julie's fitness as a parent. The first incident of concern was an automobile accident Julie had in the summer of 1999. She wrecked and almost totaled her Ford Explorer in a one vehicle accident when she drove through a Road Closed sign. Julie admits that alcohol was involved.

¶5. The problems subsided until the summer of 2001 when Michael noticed Julie exhibiting strange behavior. In May 2001, Julie called Michael, with slurred speech, pleading with him to deposit Hailey's child support early. She said that she did not have any money to make her house payment and that Hailey was not getting food and other essentials.

¶6. Michael claims things were going well between Julie and him. Visitation had always been flexible, and Julie was always very accommodating to Michael's requests to have Hailey. However, in May, 2001, Michael began having continuous visitation with Hailey. Visitation continued to be in excess until October 8, 2001, when Michael filed the motion to modify the divorce decree to obtain custody of Hailey.

¶7. On August 20, 2001, Julie was involved in a second accident. This was also a single car accident in which Julie ran her vehicle off the road and struck a telephone pole. A tow truck driver testified that he was called to the scene around 11:00 or 11:30 p.m. and the car was in the median, up against a light pole.

The tow truck driver was also able to testify that there were no tire marks on the pavement before the pole. The majority of the damage was done on the passenger side of the vehicle. Hailey was not in the car with Julie. Observation led the tow truck driver to believe that Julie was hesitant about going to the hospital. Julie denies alcohol was involved in this incident.

¶8. The Rankin Medical Center Records state that Julie broke her arm, received stitches, and suffered other minor injuries The nurse's report states that Julie was verbally abusive. Also, Julie admitted to having a few drinks that night. [1]

¶9. Naomie Ruth Smiley and her husband, both Lake Harbor volunteer firefighters, were dispatched on October 6, 2001, to respond to a domestic disturbance call at Julie's home. Julie told the Sheriff's department that she had been beat up. When Ms. Smiley and her husband arrived, the Rankin County Sheriff's deputies were already on the scene. The Sheriff's report stated that Julie knocked out the window of her boyfriend's truck. While in this angry state, Julie was referring to her boyfriend as Michael. She cut her finger in the process and smeared blood on her face to make it look like she had been hit. The boyfriend told the sheriff's department that he was afraid to leave because Julie was drunk, and he did not want her to drive her car or his corvette that was parked at her house. Julie's sister, Pam, testified that Julie flips out when she is intoxicated.

¶10. Smiley also testified that the following afternoon, she saw Julie pulled over on the side of the road taking a field sobriety test. According to Smiley, the car pulled over was a white Mustang like the one parked in Julie's driveway the night before. Also, the lady taking the sobriety test was blonde. Julie later testified that she had never been given a field sobriety test.

---

[1] Julie was found not guilty at the subsequent DUI trial.

¶11. There have been other instances where Julie has been detained by law enforcement. On October 23, 1999, around 11:00 p.m., Julie went to Michael's home, despite a court order restraining both of them from going to one another's home. Julie testified that she was going to get Hailey because she thought Michael had been drinking. Julie was transported to the police station and was told to call someone to come get her because she had been drinking. Julie testified that she had been set up by Michael because he knew she was coming and the police officers were right behind her when she arrived at Michael's house.

¶12. On January 23, 2000, Julie was arrested for trespass and disorderly conduct in Kosciusko at the home of Stephen Mitchell ("Stephen"). Julie testified that Michael told Stephen to tell her to leave and that she was not asked to leave until the police arrived. When the police arrived Stephen had Julie in the front yard, face down in the grass, with his knee on the back of her head. Julie admitted that she had been drinking and was suffering from an "alcoholic rage" at the time.

¶13. Julie was driving down Lakeland Drive early one morning when she called Michael to come get Hailey. She told Michael that she was passing out. Michael told her to pull over and he would come and get Hailey. Michael ended up getting Hailey at Cingular Wireless. It appears that she pulled over on Lakeland Drive, passed out, woke up, and then drove to Cingular Wireless. Julie came out to meet Michael, and her breath reeked of alcohol. When Julie popped the trunk, Michael noticed a gallon zip-lock bag full of pills. Julie later testified that she suffers from asthma and allergies and those were samples of allergy medicine given to her by her physician, but then she denied the incident ever happened.

¶14. In October 2001, during the State Fair, Julie suffered an attack. In a recorded telephone conversation with Michael, Julie's sister, Pam Crozier ("Pam"), stated that Julie had been on a drinking

4

binge for several days and was shaking because she needed a drink. Pam later changed her story and said Julie was suffering from a claustrophobic or an anxiety attack.

¶15.    On October 6, 2001, around 11:00 a.m. David Blanks, Michael's brother, saw Julie in a restaurant where he was working as a bartender.  He testified that when she entered the restaurant she appeared to be intoxicated. She ordered a beer and nachos and began talking with her friend.  David said they left quickly after only 15 minutes, leaving their meal and beer unfinished.  Julie admits that she was drunk.

¶16.    Michael and Stephanie were married in May 2002.  They reside in a three bedroom, two bathroom home in a subdivision in Madison.  Hailey has her own room complete with her own bed and toys. Sometime between April and May 2001, Michael and Stephanie began attending church regularly (meaning Sunday morning, Sunday night, and Wednesday night).  Both are members of the church. There are lots of children's activities in which Hailey participates.  Michael testified that Julie does not attend church. Michael also claims that children in Hailey's school class are in Hailey's Sunday school or swim class or live in their subdivision.

¶17.    Stephanie testified that she and Hailey have a wonderful relationship.  Stephanie cares for her as a mother would, reading to her at night, bathing her, taking her shopping, cooking for her, and washing her clothes.  Hailey has even began to refer to Stephanie as "Steffy Mommy."

¶18.    Michael and Stephanie do not drink or smoke.   Alcoholic beverages are not kept in their home.

¶19.    Hailey attended Ms. Jeanne's Silver Spoon ("Ms. Jeanne's") while she was in the custody of her mother.  When Michael obtained custody of Hailey on October 9, 2000, he and Stephanie began looking for a school closer to their home.  Hailey was placed on the waiting list at the First Baptist Church in Madison, where the curriculum is similar to that of Ms. Jeanne's.  Heather Baker is the Director of Child

Development at Ms. Jeanne's, and she testified that Julie was very inconsistent in the time she dropped off Hailey whereas Michael was very consistent.

¶20. On October 20, 2001, eleven days after Michael received temporary custody of Hailey, Julie voluntarily checked herself into the Mississippi Baptist Medical Center ("Baptist"). Julie's chief complaint was that "I drink beer." Julie claimed that she had an increased amount of blackouts and rages that are related to her addiction problems. Her drugs of choice included alcohol and benzodiapines. The benzodiapines that Julie was taking were prescribed to her for anxiety. She told the physicians that she had been taking them for the two months prior to seeking help, and she felt if she continued to take them that they would become a problem. Julie was detoxed with Tranxene, Ativan, Clonidine, and Trazodone. The medical report states that Julie went through detox, although she testified that she did not need it. Her progress was slow at first, but she eventually made gradual improvement.

¶21. Julie's final diagnosis states that she has a chemical dependency, generalized anxiety disorder, major depressive disorder, and nicotine dependence. Dr. Cook feels that she would greatly benefit from long-term insight oriented psychotherapy because it would give her insight into her problem and her character pathology. He feels lack of insight is a barrier to her recovery. Julie testified that she has not sought psychotherapy because she has never been told that she has a major depressive disorder. She is currently taking Celexa for her depression and chemical imbalance. Also, Julie has a strong family history of alcoholism. It also seems that Julie has a longstanding problem with anxiety and depression.

¶22. Julie stated that she tried to get help twice prior to losing custody of Hailey. Julie claims that she tried to get inpatient help at St. Dominic's Hospital for her problem, but was told that she just needed to go to Region 8 mental health counseling. When Julie went to Region 8, they said she just needed outpatient

treatment. Julie testified that she lied to the administrator at Baptist Medical Center about the amount of alcohol she had consumed in the last two weeks so they would admit her.

¶23. On November 5, 2001, Julie was released from inpatient care at Baptist. Julie now admits that she suffers from an addiction and is an alcoholic. She is aware that she can not take a few sips and stop. She is also active in proper outpatient treatment to cure her disease and addiction. On November 7, two days after she was discharged from inpatient care, she began attending extended outpatient treatment two times a week. She also attended anger management classes after being discharged with a high risk for relapse due to anger she felt towards her ex-husband.

¶24. Julie's medical records state that her recovery environment may make it difficult for her to succeed at staying sober. The records indicate that she lacks a "sober support system" and that her family continues to offer her beer. Both Julie and her mother deny that this has happened.

¶25. On March 7, 2002, Julie and Keith married in Memphis, Tennessee. Julie and Keith have plans to move from the trailer home where they were residing at the time of the trial. They were building a home that they expected to be completed two weeks after the June hearing. Hailey will have her own bedroom and bathroom.

¶26. On March 12, 2002, the chancellor finished hearing Michael's witnesses. He then made several comments regarding the direction of the trial. He told Julie that she scared him and although the visitation restrictions were relaxed a bit, he said he would have done the opposite. He also said that it appeared that Julie's family was "crawfishing" from their original positions. He felt that the main goal now seemed to get the baby, instead of what is best for the child. He told Julie that she had made excuses for everything in her medical records and that he wanted performance, not excuses. He said that he could not imagine, after

7

hearing Michael's side of the case, that she could be healthy enough in 60 or 90 days to be able to take care of Hailey.

¶27. On June 4, 2002, the hearing resumed. Julie started attending After Care twice a week under the direction of Dr. Cook. (She also tries to see Dr. LaDonna Dunn, her family physician, once a week.). Julie's AA meetings are twice a week, and Baptist randomly checks her urine one or two times a week.

¶28. Julie was allowed very liberal visitation with Hailey between the March and June hearings. Every Thursday, Cindy Woods, Julie's sister, picks up Hailey from school, and she plays with her cousins for the afternoon. Julie comes to Cindy's house to see Hailey and then Michael picks her up later in the afternoon. Julie is allowed to have Hailey every other weekend, but is not allowed to drive a car with Hailey as a passenger. Julie testified that she often calls Michael's house and has to leave message after message for anyone to return her call.

¶29. The chancellor decided ultimately to grant the petition for permanent custody modification in favor of Michael. He went through each of the factors set forth in *Albright v. Albright*, 437 So.2d 1003, 1005 (Miss. 1983). The chancellor weighed the *Albright* factors to determine which parent was more suitable to maintain primary custody of Hailey. The age of the child and the health and sex of the child weighed in favor of Julie. The chancellor found that Julie and Michael were equal on continuing care of the child and employment responsibilities. Parenting skills, willingness and capacity to provide primary care, physical and mental health and the age of the parents, moral fitness of the parents, stability of home environment and employment, and other factors were all found to be in favor of Michael. Home, school, and community records of the child and preference of the child were found to be inapplicable. After weighing the factors, on July 3, 2002, the chancellor gave Michael primary custody of Hailey. Julie was given liberal visitation

rights. ¶30. The chancellor found that Michael had met his burden by a preponderance of the evidence. Julie's mental health gave him extreme concern as to her ability to care properly for Hailey. He said that he was looking for evidence that would indicate that she was no longer at a high risk and that she does not have character pathology. The chancellor noted the lack of doctors' testimony and stated several times throughout the trial that he felt if there had been a doctor willing to give Julie favorable testimony, then he should have been presented as a witness. He commended Julie on her efforts to get well, but felt there were issues with her mental health that she was not addressing. The chancellor noted that only Julie's symptoms are gone, not her illness.

## STANDARD OF REVIEW

¶31. The standard of review in child custody cases is quite limited. A chancellor must be manifestly wrong, clearly erroneous, or apply an erroneous legal standard in order for this Court to reverse. *Mabus v. Mabus*, 847 So.2d 815, 818 (Miss. 2003).

¶32. "[F]indings of fact made by a chancellor may not be set aside or disturbed upon appeal if they are supported by substantial, credible evidence." *Marascalco v. Marascalco*, 445 So.2d 1380, 1382 (Miss. 1984); *Culbreath v. Johnson*, 427 So.2d 705, 707-08 (Miss. 1983); *Cheek v. Ricker*, 431 So.2d 1139, 1143 (Miss. 1983); *Kavanaugh v. Carraway*, 435 So.2d 697, 700 (Miss. 1983).

## DISCUSSION

### I. DID THE CHANCELLOR COMMIT MANIFEST ERROR BY MODIFYING THE CHILD CUSTODY ORDER?

¶33. In order for child custody to be modified, a non-custodial party must prove (1) there has been a substantial change in the circumstances affecting the child; (2) the change adversely affects the children's welfare; and (3) a change in custody is in the best interest of the child. *Bredemeier v. Jackson*, 689

So.2d 770, 775 (Miss. 1997); *Thompson v. Thompson*, 799 So.2d 919, 922 (Miss. Ct. App. 2001). "However, ... a chancellor is *never* obliged to ignore a child's best interest in weighing a custody change; in fact, a chancellor is bound to consider the child's best interest above all else. 'Above all, in 'modification cases, as in original awards of custody, we never depart from our polestar consideration: the best interest and welfare of the child.'" *Riley v. Doerner*, 677 So.2d 740, 744 (Miss. 1996) (quoting *Ash v. Ash*, 622 So.2d 1264, 1266 (Miss. 1993)) (citing *Marascalco*, 445 So.2d at 1382). *See also Albright v. Albright*, 437 So.2d 1003, 1005 (Miss. 1983). A modification of custody is warranted in the event that the moving parent successfully shows that an application of the *Albright* factors reveals that there had been a material change in those circumstances which has an adverse effect on the child and modification of custody would be in the child's best interest. *Sanford v. Arinder*, 800 So.2d 1267, 1272 (Miss. Ct. App. 2001).

¶34. The chancellor found that more of the *Albright* factors weighed in favor of Michael. Therefore, he granted the modification in his favor. Julie argues that while less factors weighed in her favor, these factors are "not the equivalent of a mathematical formula" and are "not an exact science." *Lee v. Lee*, 798 So.2d 1284, 1287 (Miss. 2001). "[T]he chancellor must allow full and complete proof with respect to all circumstances and conditions directly or indirectly related to the care and custody of the children, existing at the time of the original divorce decree and at the time of the modification hearing." *Smith v. Todd*, 464 So.2d 1155, 1158 (Miss. 1985) (citing *Marascalco*, 445 So.2d at 1382). It is true that the *Albright* factors are "not intended to be exhaustive but a beginning point." *Smith v. Todd*, 464 So.2d at 1158. However, this Court has also found that the *Albright* factors "should not thwart the chancellor from transferring custody of a child from one parent to another when, in the chancellor's judgment, the child's

10

welfare would be best served by such transfer." Julie's argument is without merit since she had less factors weighing in her favor; and the chancellor, upon looking at the facts, found that Hailey should be placed in the custody of her father.

¶35.    The chancellor found that Julie outweighed Michael with regards to the age of the child, the health and sex of the child, and emotional ties. All of the factors in favor of Julie are dependent on something extrinsic to her capacity as a parent. They all hinge on the fact that Hailey is a young, female child. The factors in favor of Michael weigh heavier on actual parenting capacity such as parenting skills, willingness and capacity to provide primary care, and physical and moral fitness of the home environment.

¶36.    The importance of all the factors is in no way intended to be undermined or demeaned. All the factors are important, but the chancellor has the ultimate discretion to weigh the evidence the way he sees fit. "The credibility of the witnesses and the weight of their testimony, as well as the interpretation of evidence where it is capable of more than one reasonable interpretation, are primarily for the chancellor as the trier of facts." *Chamblee v. Chamblee*, 637 So.2d 850, 860 (Miss.1994). It is obvious, by looking at the record, that the chancellor reasonably looked at all the factors and came to the correct decision.

¶37.    "The burden of proof is on the movant to show by a preponderance of the evidence that a material change in circumstances has occurred in the custodial home." *Mabus v. Mabus*, 847 So.2d at 818 (citing *Riley v. Doerner*, 677 So.2d at 743). Michael carried the burden of proving a material change in circumstances. He brought forth an insurmountable amount of evidence showing Julie's alcoholism, drug addiction, and psychological problems. Julie's only rebuttal was that she was seeking treatment for her problems. She had no doctor to testify on her behalf, only one counselor, and family members who had contradictory stories from the first hearing. The chancellor praised Julie for attempting to get her life back

11

on track, but was unconvinced that Julie was fully recovered. Julie's main argument is that the chancellor did not take her rehabilitation, her family's testimony, or her counselor's comments into account when making his decision. The chancellor stated that he believed she was just beginning the healing process, not fully recovered like she claims. Undoubtably, the chancellor is in the best position to make this determination because it is his "role...to ascertain whether witnesses and evidence are credible and the weight to give to each." *Robinson v. Lanford*, 841 So.2d 1119, 1122 (Miss. 2003) (citing *Chamblee*, 637 So.2d at 860).

¶38.    Julie points out that in *Sellers* this Court overturned a chancellor's decision by awarding custody to a father who had overcome his problem with marijuana. *Sellers v. Sellers*, 638 So.2d 481 (Miss. 1994). However, Julie's case is greatly distinguishable from *Sellers*. Sellers had been drug free for an entire year, whereas Julie had only been sober for a few months. In *Sellers*, the battle was not between two natural parents, but an aunt and the natural father. Also, *Sellers* was not a child modification case; it dealt with initial custody. ¶39.        The second factor that must be evaluated is if the change was detrimental to the child. Once again, Michael was able to present an abundant amount of evidence to prove that Hailey was in danger when she was in her mother's company. Testimony revealed that Julie was involved in car accidents, arrests, and fits of rage, all attributable to her alcoholic stupors. Julie claims that Hailey was not present when these incidents occurred and was never involved in anything that would hurt her. However, this Court has held that "where a child living in a custodial environment clearly adverse to the child's best interest, somehow appears to remain unscarred by his or her surroundings, the chancellor is not precluded from removing the child for placement in a healthier environment." *Riley v. Doerner*, 677 So.2d at 744.

¶40. Third, the court must determine if a change in custody is in the best interest of the child. Michael is able to provide a more stable environment for Hailey. Michael takes Hailey to church, owns his own home and business, and is remarried to a woman with whom Hailey has a good relationship. It was only just prior to the trial that Julie got married, began attending church, and was building a home. One of the most significant facts is that Julie had only been out of rehabilitation for 125 days when the modification hearing began. This is hardly enough time to determine if someone will be able to remain sober. It is more likely that Michael, and not Julie, will be able to provide a continuing stable environment. As this Court has stated, "the chancellor must have found that 'the overall circumstances in which a child lives have materially changed and are likely to remain materially changed for the foreseeable future and, of course, that such a change adversely impacts the child.'" *Touchstone v. Touchstone*, 682 So.2d 374, 379 (Miss. 1984) (quoting *Tucker v. Tucker*, 453 So.2d 1294, 1297 (Miss. 1984)).

¶41. The chancellor did not commit manifest error by modifying custody in favor of Michael.

## II. DID THE CHANCELLOR COMMIT MANIFEST ERROR BY ADVERSELY PREJUDGING THE CASE?

### A. Counsel's Failure to Object to the Chancellor's Failure to Recuse Himself

¶42. Julie argues that "[E]ven though a party may in fact have waived its right to assert error, this Court has the inherent power to notice it to prevent a manifest miscarriage of justice." *State Highway Comm'n of Miss. v. McDonald's Corp.*, 509 So.2d 856, 863 (Miss. 1987) (citing *Johnson v. State*, 452 So.2d 850, 853 (Miss. 1984)). Julie claims the chancellor should have recused himself because his comments made prior to hearing her side were highly prejudicial and therefore biased his opinion. This Court has held that "A judge is required to disqualify himself if a reasonable person, knowing all the circumstances, would harbor doubts about his impartiality." *Buchanan v. Buchanan* 587 So.2d 892,

895 (Miss. 1991) (quoting *Rutland v. Pridgen*, 493 So.2d 952, 954 (Miss.1986)). *See Jenkins v. State*, 570 So.2d 1191, 1192 (Miss. 1990); *In re Moffett*, 556 So.2d 723, 725 (Miss. 1990); *Collins v. Dixie Transp., Inc.*, 543 So.2d 160, 166 (Miss. 1989); *Jenkins v. Forrest County Gen. Hosp.*, 542 So.2d 1180 (Miss. 1989); *Cantrell v. State*, 507 So.2d 325, 328 (Miss. 1987). *See also Pearson v. Parsons*, 541 So.2d 447, 455 (Miss. 1989). Here, the chancellor was not partial. He heard one side of the case and even commented on not having heard her side. He was fully aware the hearing was still pending, and his statements were not meant to be prejudicial. They were merely recommendations on how he believed Julie should proceed with her side. It was clear that Michael met his burden of showing that an adverse material change had taken place.

¶43. There is a general requirement that objections must be raised at the trial level. *In re S.A.M.* 826 So.2d 1266, 1277 (Miss. 2002); *In re V.R.*, 725 So.2d 241, 245 (Miss.1998). *See Riley v. Doerner*, 677 So.2d at 743 n.3; *Smith v. State*, 572 So.2d 847, 848 (Miss. 1990); *Burney v. State*, 515 So.2d 1154, 1156-57 (Miss. 1987). This Court has stated that "[i]f no contemporaneous objection is made, the error, if any, is waived." *Dorrough v. Wilkes*, 817 So.2d 567, 577 (Miss. 2002) (quoting *Walker v. State*, 671 So.2d 581, 597 (Miss. 1995); *Hill v. State*, 432 So.2d 427, 439 (Miss. 1983)). Julie claims that the chancellor's failure to recuse himself is a matter of plain error and therefore the issue should not be barred. If the fundamental right of a party has been violated, then an appellate court will address plain error issues on appeal. *Pub. Employees' Retir. Sys. v. Dishmon*, 797 So. 2d 888, 897 (Miss. 2001). This is not the case here. The chancellor has already put a lot of time into this case. He had already presided over a majority of the hearing, including the temporary motion for modification.

¶44.	Julie argues inefficient counsel as the reason an objection was not made to the chancellor's failure to recuse himself. The standard is "that of reasonably effective assistance." ***Strickland v. Washington***, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed. 2d 674 (1984). Julie's counsel did nothing that a reasonable counselor would not have done. Her counsel worked with what little medical testimony she could find, which was only one of Julie's counselors. Also, counsel's failure to object is just further proof that the chancellor was giving advice, not prejudging the case. Julie did not have ineffective assistance; and therefore, no manifest injustice occurred by counsel's failure to ask the chancellor to recuse himself.

### B.  *Chancellor Adversely Prejudging the Case*

¶45.	Julie asserts that the chancellor interjected himself in the case and thereby showed his prejudice against Julie before he heard her side. This point is without merit. Here the chancellor was the trier of fact and law. There was no jury to prejudice. Once again, his comments regarding what he expected in the way of testimony were merely suggestions on

how Julie should proceed. The case was not adversely prejudged; and therefore, no manifest error occurred.

## CONCLUSION

¶46. The chancellor did not err in modifying the child custody of Hailey. There was sufficient evidence to show Julie lacked the ability to care for a child. There was sufficient evidence to show that a material change had occurred, that the change was detrimental, and that modification was in the best interest of the child. Therefore, the judgment of the chancery court is affirmed.

¶47. **AFFIRMED**.

**SMITH, P.J., WALLER, COBB, EASLEY AND GRAVES, JJ., CONCUR. PITTMAN, C.J., AND CARLSON, J., CONCUR IN RESULT ONLY. DIAZ, J., NOT PARTICIPATING.**