# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CA-00923-COA

**LADONNA MURRY JONES**                                                                 **APPELLANT**

**v.**

**ESSIE C. JONES, JR.**                                                                 **APPELLEE**

DATE OF JUDGMENT:               07/30/2020
TRIAL JUDGE:                    HON. CYNTHIA L. BREWER
COURT FROM WHICH APPEALED:      MADISON COUNTY CHANCERY COURT
ATTORNEYS FOR APPELLANT:        JEANINE M. CARAFELLO
                                PAMELA L. HANCOCK
ATTORNEY FOR APPELLEE:          LILLI ALICIA EVANS BASS
NATURE OF THE CASE:             CIVIL - CUSTODY
DISPOSITION:                    AFFIRMED IN PART; REVERSED AND
                                REMANDED IN PART - 11/23/2021
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE BARNES, C.J., GREENLEE AND SMITH, JJ.**

**SMITH, J., FOR THE COURT:**

¶1.     In 2014, the Madison County Chancery Court granted LaDonna Jones and Essie Jones

Jr. an irreconcilable differences divorce. On July 30, 2020, the chancellor modified the

divorce judgment to award physical custody of the parties' son to Essie. The chancellor also

reduced Essie's monthly child-support obligation from $600 to $300 and ordered LaDonna

to begin paying Essie $175 a month in child support. On appeal, LaDonna challenges the

chancellor's modification of custody and the parties' child-support obligations.

¶2.     Upon review, we find no manifest error or abuse of discretion arising from the

chancellor's modification of custody as to the parties' son. We therefore affirm that part of

the chancellor's judgment. We further find, however, that the record contains insufficient evidence of the parties' incomes and expenses to support the chancellor's modification of their child-support obligations. We therefore reverse that part of the chancellor's judgment and remand this case to allow the parties to introduce evidence upon which the chancellor can base a decision regarding child support.

**FACTS**

¶3. Over the course of their relationship, the parties had two minor children: their son Ryan and their daughter Ruth.[1] On November 6, 2014, the chancellor granted the parties an irreconcilable differences divorce. The chancellor fully incorporated the terms of the parties' child-custody and property-settlement agreement into the final judgment. The agreement provided for the following: joint legal custody of both children, physical custody to LaDonna, and reasonable visitation for Essie. The parties also agreed that Essie would pay LaDonna $600 a month in child support.

¶4. In October 2019, LaDonna filed a contempt petition against Essie, who responded and filed his own petition for contempt and for the modification of child custody and child support.[2] The chancellor held a July 21, 2020 hearing on the parties' petitions. LaDonna, Essie, and Ryan each testified. The parties stated that while Essie still resided in the former marital home, LaDonna now lived in another school district. Due to this arrangement, the parties agreed at the time of their divorce to continue to use Essie's home address for the

---

[1] We use fictitious names to protect the minor children's privacy.

[2] The parties' underlying contempt claims are not before this Court on appeal.

children's schools. The parties testified that LaDonna drove the children to Essie's home every morning during the school year so the children could catch the school bus there. At the end of each school day, the children returned to Essie's home, and after finishing their homework and eating dinner, either Essie or his wife would drive them back to LaDonna's home.

¶5. The parties further testified that from April to July 2019, both children lived solely with Essie. During most of that period, LaDonna lived in Texas and searched for a job. While LaDonna was in Texas, Essie fully cared for the children and paid for all their expenses. When LaDonna returned to Mississippi in July 2019, Ryan initially refused to return to her home. Ryan continued to live exclusively with Essie until November 2019, when he agreed to return to LaDonna's home. At the time of trial, Ryan still went to Essie's home every morning of the summer break except for those weekends when LaDonna had custody of him. Essie continued to drive Ryan back to LaDonna's home after dinner each night, where Ryan would sleep before returning to Essie's home the next morning.

¶6. Ryan, who was sixteen at the time of trial and about to begin his junior year of high school, testified that he already stayed at Essie's home on a regular basis and that he preferred to permanently live with Essie. When questioned by the chancellor, Ryan was able to recite Essie's home address but stated he did not know LaDonna's address. Ryan testified that LaDonna often yelled at him and that he argued with her several times a week. According to Ryan, LaDonna had told him that he would be "taking money out of [her pocket] and [his] sister's pocket" if he went to live with Essie. Ryan testified that he felt like

3

LaDonna "always yelled at [him] for no reason at all over little things" while Essie took the time to explain to him "when [he was] doing wrong and why . . . it's wrong."

¶7. Ryan stated that he felt LaDonna's home was not the safest place for him. In addition to the frequent yelling and fighting, Ryan testified he was scared of being locked outside by LaDonna. Both Ryan and LaDonna testified about an incident where an argument resulted in LaDonna locking Ryan outside her home. During the disagreement, Ryan walked outside. LaDonna testified that she looked outside but did not see Ryan, so she locked the door. LaDonna further testified that if Ryan had simply knocked on the door, she would have let him back into the house. Ryan claimed, however, that LaDonna had seen him outside but had not opened the door to let him back inside. According to Ryan, he had been forced to text his sister and to ask her to open the door for him.

¶8. In contrast to the circumstances at LaDonna's home, Ryan described the home environment Essie provided as "[v]ery calm [and] nice." Ryan testified that he went to his father whenever he had a problem and needed a parent's help. Ryan further stated that Essie always helped him, did not yell at him, and had never locked him out of the house. Ryan testified that Essie's home felt safer and less stressful than LaDonna's home and that he liked going to his father's home every day to get away from the arguments at his mother's home.

¶9. Following the hearing, the chancellor issued a bench ruling. The chancellor found that due to "what is occurring in the custodial parent's home[,]" Ryan had needed "to walk away from [the situation] to avoid a confrontation." She further found credible Ryan's testimony "that he ha[d] been locked out" of the custodial home and had needed "to text his

4

little sister to get in . . . ." The chancellor determined these events were traumatic for Ryan and had "affected [Ryan's] peace and dignity in the home of the custodial parent." Based on these findings, the chancellor concluded that a substantial and material adverse change in circumstances had occurred in LaDonna's home with regard to Ryan.

¶10. The chancellor next conducted an *Albright* analysis.[3] She found that none of the factors favored LaDonna and that only one factor—the parties' employment responsibilities—was neutral. The chancellor concluded that the following factors favored Essie: (1) Ryan's age, health, and sex; (2) Ryan's continuity of care since the divorce; (3) the parties' parenting skills; (4) the parties' willingness and capacity to provide primary child care for Ryan; (5) the parties' physical and mental health and age; (6) the emotional ties between the parties and Ryan; (7) the parties' moral fitness; (8) Ryan's home, school, and community records; (9) Ryan's preference; and (10) the stability of the parties' home environment and employment. The chancellor further concluded there were no other factors relevant to the parent-child relationship or Ryan's best interest that would affect her analysis.

¶11. After concluding that a modification of custody was in Ryan's best interest, the chancellor awarded Essie physical custody of Ryan and awarded LaDonna visitation with

---

[3] The factors considered in an *Albright* analysis include the following: (1) the child's age, health, and sex; (2) which parent has had "continuity of care"; (3) the parties' "parenting skills"; (4) the parties' "willingness and capacity to provide primary child care"; (5) the parties' employment responsibilities; (6) the parties' "physical and mental health and age"; (7) the "emotional ties of parent and child"; (8) the parties' "moral fitness"; (9) the child's "home, school[,] and community record[s]"; (10) the child's preference, if the child is at least twelve years old; (11) the stability of the parties' home environment and employment; and (12) any "other factors relevant to the parent-child relationship" or the child's best interest. *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983).

5

Ryan. As a result of the child-custody modification, the chancellor reduced Essie's monthly child-support payments from $600 to $300 and ordered LaDonna to begin paying Essie $175 a month in child support. The chancellor further ordered that all other provisions of the divorce judgment, including those regarding custody of Ruth, remain in full force and effect. On July 30, 2020, the chancellor entered an order in accordance with her bench ruling. Aggrieved by the chancellor's modification of child custody and child support, LaDonna appeals.

## STANDARD OF REVIEW

¶12. This Court narrowly reviews a chancellor's "ruling on a motion for modification of custody 'based on a material change in circumstances' . . . ." *Smith v. Smith*, 318 So. 3d 484, 490 (¶18) (Miss. Ct. App. 2021) (quoting *Page v. Graves*, 283 So. 3d 269, 274 (¶18) (Miss. Ct. App. 2019)). We "will not disturb a chancellor's judgment when it is supported by substantial credible evidence unless the chancellor abused her discretion, was manifestly wrong or clearly erroneous, or applied an erroneous legal standard." *Leverett v. Leverett*, 309 So. 3d 116, 120 (¶14) (Miss. Ct. App. 2020) (quoting *Gilmer v. Gilmer*, 297 So. 3d 324, 331 (¶13) (Miss. Ct. App. 2020)). We review the chancellor's "interpretation and application of the law" de novo. *Smith*, 318 So. 3d at 491 (¶18) (quoting *Taylor v. Timmons (In re C.T.)*, 228 So. 3d 311, 315 (¶6) (Miss. Ct. App. 2017)).

## DISCUSSION

### I.     Modification of Child Custody

¶13. LaDonna asserts that insufficient evidence supported the chancellor's finding

regarding an adverse material change of circumstances in the custodial home. LaDonna also contends that the chancellor misapplied the *Albright* factors in determining whether a custody modification was in Ryan's best interest. As a result, LaDonna argues the chancellor clearly erred by modifying custody of Ryan.

### A. Adverse Material Change

¶14. To modify child custody, the noncustodial parent must prove that (1) "a material change of circumstances has occurred in the custodial home since the most recent custody decree"; (2) "the change adversely affects the child"; and (3) the modification is in the child's best interest. *Stewart v. Stewart*, 309 So. 3d 44, 83 (¶126) (Miss. Ct. App. 2020) (quoting *Powell v. Powell*, 976 So. 2d 358, 361 (¶11) (Miss. Ct. App. 2008)). "Totality of the circumstances can serve as a basis for a material change." *Munday v. McLendon*, 287 So. 3d 303, 310 (¶28) (Miss. Ct. App. 2019). "In analyzing whether a material change of circumstances has occurred, the chancellor must consider the totality of the circumstances." *Domke v. Domke*, 305 So. 3d 1233, 1240 (¶17) (Miss. Ct. App. 2020) (internal quotation marks omitted). "If, after examining the totality of the circumstances, a material change in circumstances in the custodial home is found to have occurred, the chancellor 'must separately and affirmatively determine that this change is one which adversely affects the child.'" *Munday*, 287 So. 3d at 310 (¶28) (quoting *Bredemeier v. Jackson*, 689 So. 2d 770, 775 (Miss. 1997)).

¶15. After considering the parties' testimony, the chancellor determined that the totality of the circumstances showed a material change at LaDonna's home since the entry of the

7

divorce judgment that was adverse to Ryan. In finding such a change, the chancellor relied on Ryan's testimony about the repeated confrontations he and LaDonna had engaged in since the parties' divorce. Ryan, who was sixteen at the time of the hearing, testified that LaDonna's home felt less safe and more stressful for him than Essie's home. According to Ryan, he and LaDonna argued multiple times each week. Although Ryan testified that LaDonna also yelled at his younger sister Ruth, he opined that his mother yelled at him more often and that she "always yelled at [him] for no reason at all over little things."

¶16.    Ryan further stated he was scared that if he tried to walk away from the confrontations with his mother, he would get locked out of the house again. Ryan and LaDonna both testified about the argument that ended with Ryan walking outside to get away from the disagreement. LaDonna stated that she locked the door afterward because she did not see Ryan outside. Ryan disputed his mother's testimony, however, and claimed that she had seen him but had chosen not to unlock the door for him. According to Ryan, he finally had to text Ruth and ask her to let him back inside the home.

¶17.    The chancellor concluded the recurring negative interactions between Ryan and LaDonna since the entry of the divorce judgment constituted a material change in circumstances for Ryan. The chancellor further found the changes had adversely affected Ryan by causing him trauma and by "affect[ing] his peace and dignity" in LaDonna's home. As this Court has repeatedly recognized, "[t]he chancellor, by her presence in the courtroom, is best equipped to listen to witnesses, observe their demeanor, and determine the credibility of these witnesses and what weight ought to be ascribed to the evidence given by those

8

witnesses." *Munday*, 287 So. 3d at 312 (¶38) (quoting *Rogers v. Morin*, 791 So. 2d 815, 826 (¶39) (Miss. 2001)). Upon review, we conclude the record contains sufficient evidentiary support for the chancellor's findings. And in view of the totality of the circumstances presented, we cannot say that the chancellor abused her discretion or manifestly erred in determining that an adverse material change in circumstances had occurred in the custodial home with regard to Ryan. Accordingly, we find this assignment of error lacks merit.

### B. *Albright* Analysis

¶18. After concluding that Essie had proved an adverse material change, the chancellor "appl[ied] the *Albright* factors to determine whether modification [was] in [Ryan's] best interest." *Munday*, 287 So. 3d at 311 (¶33) (quoting *White v. White*, 26 So. 3d 342, 351 (¶28) (Miss. 2010)). The chancellor concluded that only one factor—the parties' employment responsibilities—was neutral and that all other factors weighed in Essie's favor. She further concluded there were no other factors relevant to the parent-child relationship or Ryan's best interest that she needed to consider in her analysis. On appeal, LaDonna argues that the evidence failed to support the chancellor's findings as to six factors. She therefore asserts that the chancellor misapplied the *Albright* factors in determining that a modification of custody served Ryan's best interests.

¶19. "[T]o determine whether or not the chancellor was manifestly wrong or clearly erroneous, or abused her discretion in applying the *Albright* factors, we review the evidence and testimony presented at trial to ensure her ruling was supported by the record." *Id.* at 312 (¶36) (quoting *Hollon v. Hollon*, 784 So. 2d 943, 947 (¶13) (Miss. 2001)). "[T]he

interpretation of evidence[,] where it is capable of more than one reasonable interpretation, [is] primarily for the chancellor [to determine] as the trier of facts." *Id.* at (¶35) (quoting *Johnson v. Gray*, 859 So. 2d 1006, 1014 (¶36) (Miss. 2003)). While each *Albright* factor is important, "the chancellor has the ultimate discretion to weigh the evidence as she sees fit." *Id.* (quoting *Johnson*, 859 So. 2d at 1013-14 (¶36)). As always in child-custody cases, the "polestar consideration" remains "the best interest and welfare of the child." *Stewart*, 309 So. 3d at 83 (¶127) (quoting *Riley v. Doerner*, 677 So. 2d 740, 744 (Miss. 1996)).

### 1. Continuity of Care

¶20. LaDonna first challenges the chancellor's finding that continuity of care for Ryan since the divorce favored Essie. She argues the chancellor failed to consider that both children had resided with her since the parties' divorce and that Essie was preparing to sell the former marital home where he resided.

¶21. Upon review, we find no merit to LaDonna's argument. At the time of the hearing, Essie still lived in the marital home, and thus, any future plans to sell the home had no bearing on the continuity of care he had provided to Ryan since the parties' divorce. Further, as Essie testified, his new home would remain in the same school district and would therefore not interfere with or alter the children's school attendance. In addition, contrary to LaDonna's assertions, the chancellor did consider Ryan's residence since the divorce in reaching her decision. The parties agreed that even after the divorce they continued to use Essie's address as the children's residence for school purposes. Further, the parties testified that LaDonna drove the children to Essie's home each morning during the school year so the

children could catch the bus from there. And each afternoon, the children returned to Essie's home after school before Essie or his wife drove them back to LaDonna's home. Based on Ryan's own testimony, the chancellor concluded that Ryan considered Essie's home to be where he lived and that he (Ryan) did not even know LaDonna's physical address.

¶22. During the summer months, Ryan continued to prefer to spend almost every day at Essie's home rather than LaDonna's home. Although Ryan returned to LaDonna's home at night, the chancellor determined that he did so merely to sleep before he went back to Essie's home the following morning. The parties' testimony also reflected that from April to July 2019, the children resided solely with Essie while LaDonna looked for a job in Texas. When LaDonna returned to Mississippi in July 2019, Ryan refused to return to her home and continued to live with Essie until November 2019. Based on such evidence, we find no abuse of discretion or manifest error in the chancellor's conclusion that continuity of care for Ryan since the divorce actually favored Essie.

### 2. Physical and Mental Health and Age

¶23. LaDonna next contends that no evidence supported the chancellor's finding that the parties' physical and mental health and age favored Essie. Although the parties' offered no testimony regarding their ages or physical health, the chancellor concluded that the mental-health component of this factor weighed against LaDonna. In reaching this determination, the chancellor specifically focused on the events that occurred between April and November 2019 related to LaDonna's move to and from Texas. The chancellor noted that LaDonna presented no evidence at the hearing that she ever visited with the children or communicated

11

with them during her time in Texas. Instead, the record reflected that the children lived solely with Essie during that period and that he provided for all their expenses. The chancellor further noted that even after LaDonna returned to Mississippi in July 2019, Ryan refused to go back to her home for four months. Based on the testimony and evidence before her, the chancellor concluded that these facts spoke to LaDonna's mental health and ultimately weighed against her. "The credibility of the witnesses and the weight of their testimony, as well as the interpretation of evidence where it is capable of more than one reasonable interpretation, are primarily for the chancellor as the trier of facts." *Munday*, 287 So. 3d at 312 (¶35) (quoting *Johnson*, 859 So. 2d at 1014 (¶36)). Because we cannot say that the chancellor abused her discretion or manifestly erred in concluding that this factor weighed in Essie's favor, we find this assignment of error lacks merit.

### 3. Moral Fitness

¶24. LaDonna also asserts the chancellor erred by finding that consideration of the parties' moral fitness weighed in Essie's favor. With regard to this factor, the chancellor stated the following during her bench ruling:

> Now that the father is married and no longer living outside the bonds of wedlock in the presence of the children, the Court is not going to hold that against him. I do find that moral fitness also requires one to pay one's bills, and I see an attempt of late to catch his [(Essie's)] child support up to date and an attempt to have the former marital domicile sold. Thus[,] the Court finds that the moral fitness has improved on the part of the father. I cannot state that your ability to not control your anger or your frustration with [your] sixteen-year-old [son] is in your favor, madam, so I have to have that factor favor the father.

¶25. As Ryan and LaDonna both testified, they regularly argued with each other. They also

both testified that one argument between them resulted in Ryan walking outside and LaDonna locking him out of the house. Although their opinions differed as to whether LaDonna had intentionally locked Ryan outside and then refused to let him back into the house, the chancellor found Ryan's testimony on the incident credible. Upon review, we find that it was within the chancellor's discretion to weigh the evidence about events that had occurred since the parties' divorce in Essie's favor and to find that this factor favored him. We therefore find no error.

### 4. Home, School, and Community Records

¶26. LaDonna next contends the chancellor erred in finding that Ryan's home, school, and community records favored Essie. The record reflects, however, that Essie lived in the former marital home while LaDonna had lived at her current residence for about a year. As previously discussed, even after their divorce, the parties continued to use Essie's home address for everything related to the children's education. LaDonna drove the children to Essie's home every morning prior to school to catch the bus, and they then rode the bus back to Essie's home in the afternoons. After completing their homework and eating dinner at Essie's home, the children returned to LaDonna's home for the remainder of the evening. Essie testified that he always helped his children complete their homework and that he attended as many of their school functions as he could. Ryan also testified that Essie helped with his homework, and he stated that he sought Essie's advice when he had a problem. Even during the summer, Ryan stated that he preferred to spend, and did spend, most of his time at Essie's home. Ryan testified that he considered Essie's home to be where he lived

13

and that he did not even know LaDonna's home address. Because the record contains substantial credible evidence to support the chancellor's finding that Ryan's home, school, and community records favored Essie, we find no error with regard to this factor.

### 5. Stability of the Home Environment and Employment

¶27. Despite LaDonna's assertions to the contrary, we find substantial credible evidence supported the chancellor's determination that the stability of the parties' home environment and employment favored Essie. Essie testified that he lived in the former marital home but that he and his wife were building a new home in the same school district. Essie stated that the new home would have bedrooms for both children and that he and his wife would like to have the children live with them. As previously discussed, Essie presented testimony that the children were at his home almost every day and that he helped with their homework. As Ryan testified, he felt that the environment at Essie's home was safer, calmer, and less contentious than the environment at LaDonna's home. In addition, Essie testified that he had worked at his current employment for seventeen-and-a-half years and that his salary had increased during that time. Although Essie had been furloughed for a little while during the coronavirus pandemic, he testified that at the time of the hearing he had resumed working on a full-time basis. In contrast, the chancellor heard testimony that LaDonna had moved to Texas for several months in 2019 to search for a job, had lived in her current residence for about a year, and had just begun a new job around the time of the hearing. Based on the parties' testimony, we find no abuse of discretion or manifest error in the chancellor's determination that this factor favored Essie.

### 6.     Other Relevant Factors

¶28.    Finally, LaDonna challenges the chancellor's finding that no other factors relevant to the parent-child relationship or Ryan's best interest affected her analysis.  In raising this assignment of error, LaDonna notes that the chancellor expressed her reluctance to separate siblings in custody matters.  Because the chancellor's custody decision separated the parties' siblings, LaDonna argues this factor favors her.  After the chancellor's statement regarding her general reluctance to separate siblings, she acknowledged that Ryan "already believes he has been split from his sibling by the behavior of his mother[,]" whom he feels treats him differently than his sister.  The chancellor therefore stated that under the circumstances of the present case, she did not believe splitting custody of the children would harm their relationship as long as the children continued to spend time together in each parent's home.  After review, we find sufficient evidentiary support for the chancellor's conclusion.  We therefore find no manifest error or abuse of discretion.

### II.     Modification of Child Support

¶29.    After modifying child custody and awarding Essie physical custody of Ryan, the chancellor reduced Essie's monthly child-support obligation from $600 to $300 and ordered LaDonna to pay Essie $175 a month in child support.  On appeal, LaDonna asserts that the parties never submitted to the chancellor any financial evidence such as Rule 8.05 financial statements,[4] tax returns, or W-2 forms.  Without such information as to the parties' incomes, expenses, assets, and liabilities, LaDonna contends that the chancellor erred by modifying

---

[4] UCCR 8.05.

their child-support obligations.

¶30.    "[I]n child-support matters, a chancellor is afforded considerable discretion . . . ." *Dixon v. Olmstead*, 296 So. 3d 227, 232 (¶18) (Miss. Ct. App. 2020). As we acknowledged in *Dixon*,

> [t]he process of weighing evidence and arriving at an award of child support is essentially an exercise in fact-finding, which customarily significantly restrains this Court's review.
>     A chancellor may modify a child-support award if there has been a substantial or material change in the circumstances of one or more of the interested parties. The child[-]support calculation guidelines set forth in [Mississippi Code Annotated] section 43-19-101(1) [(Rev. 2015)] establish that a child-support award for one child should be fourteen percent of the noncustodial parent's adjusted gross income. Section 43-19-101(3) provides the method of calculating the adjusted gross income. We recognize that a rebuttable presumption exists that the amount set forth in the statutory guideline is correct both in determining the amount of the initial award and in modifying that award.

*Id.* at (¶¶18-19) (citations and internal quotation marks omitted).

¶31.    As the record here reflects, Essie's original child-support obligation of $600 a month was established by the parties in their child-custody and property-settlement agreement rather than by the chancellor's examination of the parties' financial disclosures and application of the statutory child-support guidelines. Even so, our caselaw recognizes that "[t]he rules governing [a] modification proceeding [pursuant to an irreconcilable differences divorce child-support agreement] are the same as if the chancellor had made a support award after a contested divorce trial." *Tedford v. Dempsey*, 437 So. 2d 410, 417 (Miss. 1983). In either instance, the child-support obligations "are subject to modification only upon [a] showing of a substantial or material change in circumstances" of one or more of the interested parties.

16

*Id.*

¶32.    Mississippi Code Annotated sections 43-19-101 and 43-19-103 (Rev. 2015) set forth the child-support guidelines (and the exceptions to these guidelines) and provide a clear framework of the evidence to be considered in establishing or modifying an award of child support.  After a thorough review, we find the record contains insufficient evidence of the parties' incomes and expenses at the time of the hearing.  Without such evidence, we cannot say on appeal that a sufficient basis existed for the chancellor's modification of the parties' child-support obligations.[5]  We therefore must reverse that part of the chancellor's judgment and remand the case to allow the parties to introduce evidence upon which the chancellor can base her determination of their child-support obligations.

**CONCLUSION**

¶33.    Because we find no error in the chancellor's decision to modify custody of the parties' son, we affirm that portion of the chancellor's judgment.  We find, however, that the record lacks evidence of the parties' incomes and expenses upon which to base a modification of their child-support obligations.  We therefore reverse the chancellor's modification of child support and remand the case to allow the parties to submit additional relevant evidence.

¶34.    **AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

        **BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, McDONALD, LAWRENCE, McCARTY AND EMFINGER, JJ., CONCUR.  WESTBROOKS, J.,**

---

[5] Section 43-19-101(1) establishes that child support for one child should be fourteen percent of the noncustodial parent's adjusted gross income and that child support for two children should be twenty percent of the noncustodial parent's adjusted gross income. Thus, from the record before us, it appears that the reduction of Essie's monthly child-support payment by half would not be justified under the statutory child-support guidelines.

17

**CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION.**