# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-CA-01314-COA

**HOUSTON COREY GRANTHAM**                                                    **APPELLANT**

**v.**

**JULIA TAYLOR GINN**                                                                  **APPELLEE**

DATE OF JUDGMENT:            02/24/2021
TRIAL JUDGE:                 HON. KILEY CATLEDGE KIRK
COURT FROM WHICH APPEALED:   CARROLL COUNTY CHANCERY COURT,
                             FIRST JUDICIAL DISTRICT
ATTORNEY FOR APPELLANT:      GEORGE HOWARD SPINKS
ATTORNEYS FOR APPELLEE:      MICHELLE DEAN EASTERLING
                             LYDIA QUARLES
NATURE OF THE CASE:          CIVIL - DOMESTIC RELATIONS
DISPOSITION:                 AFFIRMED - 06/27/2023
MOTION FOR REHEARING FILED:

**BEFORE CARLTON, P.J., LAWRENCE AND SMITH, JJ.**

**SMITH, J., FOR THE COURT:**

¶1.     Houston Grantham filed an unsuccessful petition in the Carroll County Chancery Court to modify the court's custody order for his minor son Logan and for other relief.[1]  On appeal from the chancellor's final order, Houston argues that the chancellor erred by denying his request for custody modification.  Finding no error, we affirm.

## FACTS

¶2.     During their dating relationship, Houston Grantham and Julia Ginn resided in Starkville, Mississippi.  Their son Logan was born in 2013, and the parties separated in 2015.

---

[1] We use a pseudonym to protect the privacy of the minor child involved in this matter.

On December 13, 2016, the chancellor entered an agreed order that awarded the parties joint legal custody, Julia sole physical custody, and Houston reasonable visitation. Houston moved to Kosciusko, Mississippi, and became employed at a local restaurant. He eventually married Allison Grantham in September 2018, and the couple subsequently had a son. In the meantime, Julia remained in Starkville and later married David Harned in 2020.

¶3. In July 2017, Julia asked Houston to assume primary care for Logan while she moved to a new residence following a breakup with a boyfriend. Although Julia testified that she had anticipated Logan staying with Houston for about an extra "week or two at the most[,]" Houston did not return Logan to Julia's custody until February 2018. Shortly after Logan was returned to her custody, Julia received a home visit in March 2018 from the Oktibbeha County Child Protection Services (CPS). CPS's inquiry stemmed from allegations reported by Houston. Houston reported that Julia had been using drugs and that Logan had rug burns and bruising on his body and bugs crawling in his hair. Julia passed a drug test, and a physician examined Logan without finding anything of concern. Houston later acknowledged at a hearing that he did not address any concerns with Julia before contacting CPS. The chancellor also noted that Houston did not feel a need to take Logan to a doctor for the rug burns because he (Houston) did not think the rug burns merited medical attention. Instead, Houston testified that his primary concern in making the allegations to CPS was his unsubstantiated belief that Julia had been using drugs.

¶4. In August 2018, Houston lodged another complaint with CPS regarding the conduct of Julia's then-boyfriend toward Logan and possible drug use in Julia's home. Geleisa Gill,

2

a CPS specialist, investigated Houston's claims and performed a walkthrough of Julia's home. After taking a random drug test, Julia tested positive for cocaine. To avoid Logan being placed in foster care, Julia agreed to have him returned to Houston's care. Julia testified her understanding of the agreement was that CPS would return Logan to her after she successfully completed ten Narcotics Anonymous classes and passed several urine tests.

¶5. On October 17, 2018, Houston filed a petition for modification of child custody and for other relief. Houston alleged that since the entry of the prior agreed order on December 13, 2016, a material and substantial change in the parties' circumstances had occurred that warranted modification of custody. He further asserted that child-custody modification was in Logan's best interest.

¶6. Meanwhile, in both October and November 2018, Julia passed her urine tests. However, a hair-follicle test administered in December 2018 showed positive results for methamphetamine and cocaine. Following the failed drug test, Julia enrolled in a drug-rehabilitation program from February 2019 to March 2019. During that time, Julia received only one visit with Logan, which occurred in mid-February. Julia testified that after completing her drug-rehabilitation program, she continued to attend counseling sessions.

¶7. Gill, the CPS specialist involved with the parties' case, testified that she attempted to contact Julia to schedule a final meeting to discuss Logan's return to Julia's care. Gill further testified, though, that her attempts to schedule a meeting with Julia were unsuccessful. Julia stated that she attempted to contact Gill multiple times through text messages and emails. Gill indeed acknowledged these attempts, which Julia stated were made in an effort to have

3

a written record of all communication. Regardless of the exact nature of these communication attempts, however, CPS closed the case, and Gill notified Houston that Logan would remain in his care.

¶8. On April 11, 2019, Julia filed a petition for emergency relief and for a citation of contempt. Julia asserted that since February 23, 2019, Houston had repeatedly denied her requests to visit with and contact Logan. She further asserted that Houston was in willful contempt of the chancellor's December 13, 2016 order. During a hearing on the matter, Houston admitted that Julia had contacted him on numerous occasions and had unsuccessfully requested visits with Logan. Following the hearing, the chancery court entered several orders that provided Julia in-person and telephonic visitation with Logan. The chancellor also suspended Houston's child-support obligation.

¶9. In June and October 2019, the chancellor ordered Julia to submit to random drug tests. Julia successfully passed both tests. In July 2020, the court entered an order to appoint licensed counselor and therapist Wendie Woods to evaluate, diagnose, and treat Logan as Woods found necessary. The chancellor directed the parties to cooperate with Woods and to provide Woods with complete copies of Logan's prior counseling records. In addition, the chancellor ordered Woods to provide a report "as to the origin and/or cause of [Logan's] behavioral issues, if any, and a status on [Logan's] treatment as same progresse[d]" and to present her findings and recommendations at the hearing on the matter.

¶10. Over a four-day hearing that spanned several months, the parties presented testimony and evidence regarding Houston's petition to modify custody and Julia's contempt claim

against Houston. On February 24, 2021, the chancery court entered an order to deny Houston's complaint for child-custody modification. Over the course of a thirty-four-page order, the chancellor found that although a material change in circumstances had occurred, Houston had failed to prove that the change adversely affected Logan or that a modification of custody was in Logan's best interest. Houston filed separate motions seeking a new trial, judgment notwithstanding the verdict, a stay in the proceedings pending appeal, and reconsideration of the chancellor's final order. The chancellor denied each of Houston's motions. Aggrieved, Houston appeals from the chancellor's February 24, 2021 order.

## STANDARD OF REVIEW

¶11. We apply the following standard of review to these domestic-relations matters:

> This Court will not disturb a chancellor's findings unless they were manifestly wrong or clearly erroneous, or the chancellor applied an erroneous legal standard. Chancellors are afforded wide latitude in fashioning equitable remedies in domestic-relations matters, and their decisions will not be reversed if the findings of fact are supported by substantial credible evidence in the record. When reviewing a chancellor's decision, we will accept a chancellor's findings of fact as long as the evidence in the record reasonably supports those findings. The chancellor's interpretation and application of the law is reviewed de novo.

*Kay v. Kay*, 352 So. 3d 198, 203 (¶17) (Miss. Ct. App. 2022) (quoting *Stuckey v. Stuckey*, 341 So. 3d 1030, 1036 (¶13) (Miss. Ct. App. 2022)).

## DISCUSSION

¶12. Houston argues that the chancellor erred by failing to modify custody. According to Houston, the evidence and testimony presented at the hearing showed that a material and substantial change in the parties' circumstances had occurred that adversely affected Logan.

5

Houston further asserts that the testimony and evidence clearly showed a modification of custody was in Logan's best interest.

¶13.    As this Court has previously explained,

> [a] modification of custody requires the noncustodial parent to prove: (1) that a material change of circumstances has occurred in the custodial home since the most recent custody decree, (2) that the change adversely affects the child, and (3) that modification is in the best interest of the child.  In determining whether a material change in circumstances has occurred, the chancery court must consider the totality of the circumstances.  Even though under the totality of the circumstances a change has occurred, the court must separately and affirmatively determine that this change is one which adversely affects the children.  Any change in custody must be predicated on the conduct of the custodial parent that poses a danger to the mental or emotional health of the child.  Furthermore, the party seeking the modification of custody bears the burden of proving by a preponderance of the evidence that a material change in circumstances has occurred in the custodial home.  Our supreme court observed that above all, in modification cases, as in original awards of custody, we never depart from our polestar consideration: the best interest and welfare of the child.

*Stuckey*, 341 So. 3d at 1036 (¶15) (citations and internal quotation marks omitted).  We also recognize that "[s]ubstantial deference is given to a chancellor's findings, as the chancellor 'has the ultimate discretion to weigh the evidence the way he sees fit in determining where the child's best interest lies.'"  *Id.* at (¶16) (quoting *Stewart v. Stewart*, 309 So. 3d 44, 82 (¶127) (Miss. Ct. App. 2020)).

¶14.    Here, the chancellor first considered whether a material change in circumstances had occurred in Julia's home since the entry of the December 13, 2016 order.  The chancellor concluded Houston had sufficiently proved that a material change in circumstances had occurred in Julia's home.  In finding a material change, the chancellor found relevant the evidence of Julia's narcotics use, some of her personal choices regarding boyfriends, and her

6

multiple changes in residence.

¶15.    The chancellor next considered whether the change in circumstances had adversely affected Logan.  In so doing, the chancellor found that Houston's evidence focused on the potential for adverse impact to Logan rather than any actual adverse impact to the child. When questioned by both Julia's attorney and the chancellor, Houston was unable to point to any instances when Logan suffered neglect or injury due to Julia's actions or perceived inattention.  In Houston's own words, he lacked any "physical proof."  The chancellor also considered conflicting testimony from Houston and his mother on one side and from Julia, her husband, her mother, and her friend on the other side as to the quality of Julia's relationship with Logan.  Based on the totality of the circumstances, the chancellor found that while Logan's actions reflected "suffering," this impact was due more to Houston's conduct than Julia's conduct.  In reaching this finding, the chancellor referenced Houston's actions in keeping Logan from Julia for almost eight months, as well as Houston's first unsubstantiated claims against Julia in an effort to have CPS remove Logan from Julia's home.

¶16.    Despite finding that the environment of Julia's home had not adversely affected Logan, the chancellor still considered whether a modification of custody would be in Logan's best interest.  In discussing Julia's prior history of recreational use of illegal substances, the chancellor found credible Julia's testimony that she had used them at times as a mechanism to cope with being separated from Logan for such long periods and had never used illegal substances when Logan was present.  In addition, although Julia had failed several drug tests

7

early on in the litigation, the chancellor noted that Julia had since completed a drug-rehabilitation program and had more recently passed two court-ordered random drug tests.

¶17.    In discussing Julia's past moves from residence to residence, the chancellor found that "[t]hese moves ha[d] not revealed any negative impact on the child either separately or collectively that can be attributed to this child's issues."   Moreover, the chancellor recognized that no allegations had been raised regarding the safety of the separate residences. Next, the chancellor discussed Julia's romantic relationships since her separation from Houston.  In August 2018, Houston made allegations to CPS regarding potential drug use in Julia's home and his concern that Julia's then-boyfriend had "blown up" on Julia and Logan. The chancellor acknowledged Houston's assertions but recognized that apart from this single claim, "there were no proven allegations shedding light on any bad behavior" by Julia's past boyfriends.  The chancellor also noted that Julia was now in a stable marriage and that her husband appeared to be even-tempered, mature, and thoughtful.

¶18.    Finally, the chancellor considered the testimony and recommendation provided by Woods, who had been a therapist for twenty-six years and had spent over twenty years working with children and families.  At the time of Woods's testimony, she had met with and counseled Logan five times.  Woods stated that after her personal interactions with Logan, she had reviewed the notes provided from his prior therapy sessions.  As a result of her conversations with Logan, Woods testified that she could find no instances where Logan had experienced harm while in Julia's care.  In addition, Woods stated that Logan did not "disclose any statements indicative of past trauma[,]" and she did not note any signs of

observable trauma due to conduct attributable to Julia. The chancellor noted that "Woods opined that keeping a child away from a biological parent can be detrimental when those periods of time are extended." Even so, Woods testified that Logan did not display any mistrust of Julia due to their separation, and the one concern he verbalized was not being able to see his mother for a long time. Based on the testimony and evidence, the chancellor concluded that Houston not only had failed to prove that Julia's conduct posed a danger to Logan's mental or emotional health but also had failed to prove that a modification of custody was in Logan's best interest.

¶19. Upon review, we conclude that the chancellor was not manifestly wrong or clearly erroneous in his findings of fact, nor did he apply an erroneous legal standard. "The chancellor has the ultimate discretion to weigh the evidence the way he sees fit. The credibility of the witnesses and the weight of their testimony, as well as the interpretation of evidence where it is capable of more than one reasonable interpretation, are primarily for the chancellor." *Ethridge v. Ethridge*, 226 So. 3d 1261, 1264 (¶13) (Miss. Ct. App. 2017) (quoting *Johnson v. Gray*, 859 So. 2d 1006, 1013-14 (¶36) (Miss. 2003)). Because the record here contains substantial credible evidence to reasonably support the chancellor's findings of fact, we affirm the chancellor's order denying Houston's request for a modification of child custody.

## CONCLUSION

¶20. Finding no manifest error or abuse of discretion, we affirm the chancellor's order denying a modification of child custody.

¶21.	**AFFIRMED.**

      **BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND EMFINGER, JJ., CONCUR.**